Edythe SHUMAN, Plaintiff, Appellee,

v.

UNITED STATES of America, Defendant, Appellant.

No. 84–1884.

United States Court of Appeals, First Circuit.

Argued March 5, 1985.

Decided June 26, 1985.

---

David S. Fishback, Washington, D.C., with whom Peter A. Nowinski, Sp. Litigation Counsel, Gail Killefer, Richard K. Wil-lard, Acting Asst. Attys. Gen., Washington, D.C., William F. Weld, U.S. Atty., Boston, Mass., Robert S. Greenspan and Marc Richman, Appellate Staff, Dept. of Justice, Washington, D.C., were on brief, for defendant, appellant.

Edward T. Dangel, III, Boston, Mass., with whom Dangel & Sherry, P.C., Boston, Mass., was on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

In this action, plaintiff Edythe Shuman, who is administrator of the estate of her husband, George Shuman, claims that the United States is liable in damages pursuant to the Federal Tort Claims Act for the asbestos-induced injuries that led to his death. At the conclusion of a bench trial, the district court held the United States liable for shipowner negligence under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b), and ordered it to pay $145,013 as stipulated damages. Although the United States presses a number of issues on appeal, including claims of clearly erroneous findings of fact, it is necessary to discuss only one. We hold that this action is barred under the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and, accordingly, reverse.

*Factual Background*

Although there are disputes as to some material facts, most do not bear on our disposition of the case. Thus, except where noted, we assume *arguendo* that the facts found by the district court are amply supported by the record.

Shuman worked as a third-class shipfitter for Bethlehem Steel Corporation (Bethlehem) at the Fore River Shipyard (Shipyard) in Quincy, Massachusetts, during part of 1942, and again from 1951–53. During his first period of employment for Bethlehem, he worked on new construction, such as fitting plates and bulkheads into the hulls of ships, making templates, and

doing layout work. Following a three-year enlistment in the Navy and five years working for another company, Shuman returned to the Shipyard in 1951 for approximately three years. The district court did not make any findings regarding whether Shuman's duties differed any during this second employment period with Bethlehem. From 1953 until shortly before the discovery of his fatal illness in 1976, Shuman was employed as a sheet metal worker for a private company in the Boston area.

Although it was a contested issue of fact below, the district court determined that Shuman died as a result of mesothelioma, a malignancy of the pleural cavity lining positively correlated with inhalation of asbestos fibers, and not from a lung cancer possibly resulting from Shuman's heavy cigarette smoking. This finding is not appealed. Plaintiff contends, and the district court so found, that in 1942, "Shipyard workers, including Shuman, were regularly exposed to high levels of asbestos dust ...," that respirators were not worn, and that inadequate ventilation was provided to areas where asbestos products were utilized. The court also found that Shuman was never exposed to significant quantities of asbestos dust anywhere except at the Shipyard. The court further determined that approximately half of naval construction work occurred after the ships had been launched, and that "it was probable that Shuman worked on vessels which had been launched on navigable waters."

The district court also made a series of findings regarding the role of the United States, especially the Navy, which was the contracting agency with Bethelem for the production of ships during the period at issue. These findings were focused on the Navy's role in promulgating and enforcing safety and health standards at the Shipyard. A brief summary of the organizational structure of the government's office at Bethlehem's Fore River Shipyard is essential background to an understanding of the district court's findings and an analysis

of the discretionary function exception in this context.

In 1942, in private shipyards which contracted with the government for the construction of naval vessels, such as the Fore River yard, the government's representatives on site were part of the Supervisor of Shipbuilding's staff (SUPSHIP). The Supervisor of Shipbuilding at a shipyard, including the one at issue here, was the head federal employee on site.[1] He and his staff of engineers and skilled tradespersons were responsible for the attainment of technical standards as stated in the plans and specifications for the ships, for work completion according to schedule, and for quality workmanship in the various trades. A large part of this staff was drawn directly from the ranks of the Shipyard employees, and the Supervisor of Shipbuilding attempted to have the most experienced and skilled persons in each trade join his staff as inspectors in that particular line of work. On a daily basis, these inspectors fanned out through the ships being constructed to monitor and sign off on the various quality control tests that were performed on the ship, such as on the welded joints, installation of heaters and lockers, electrical wiring and instrumentation, and on the vast array of other parts and installations that comprise a ship. As the district court noted, "industrial safety was not the reason for these inspections."

The district court made the following findings of fact regarding the Navy's knowledge of and response to asbestos hazards: (1) "Navy inspectors from the Supervisor of Shipbuilding's staff inspected areas of the Shipyard in which asbestos and asbestos dust was open and obvious"; (2) "upper echelon Navy officials knew at least as early as 1940, and probably earlier, that asbestos dust posed a significant health hazard"; (3) this information, including the fact-finding studies that were performed, was disseminated through a number of channels; (4) in 1943, after Shuman's first period of work at the Shipyard, the Navy promulgated a document entitled "Mini-

1. The SUPSHIP office was technically not on site but across the street from the Shipyard.

mum Requirements for Safety and Industrial Health in Contract Shipyards" (hereinafter "Minimum Requirements") which dealt in part with the hazards of asbestos dust; (5) the "Secretary of the Navy stated that he expected 'full and complete compliance' with the Minimum Requirements" and imposed these standards on shipyards operating under Navy contracts as well as the Navy's own yards. On the basis of these facts, the district court concluded that

> it is more probable than not that the Supervisor of Shipbuilding and his subordinates actually knew as early as 1942 that significant levels of asbestos dust were present in the Shipyard and posed a hazard to Shipyard workers, and that the Navy had assumed responsibility for minimizing this hazard.

We pause to note that, based on our reading of the record, we must rule as clearly erroneous the court's finding that the Navy had assumed responsibility for minimizing the asbestos hazard during the times relevant in this case. As we discuss in greater detail *infra*, the Navy made efforts to minimize occupational hazards at shipyards *after* Shuman departed from the Shipyard in 1942 and eliminated its program at the close of World War II in 1945, several years *prior* to Shuman's return in 1951.

Although the district court made no findings of fact on the origin of the Minimum Requirements, nor on any Navy or government role vis-a-vis Bethlehem in promoting or enforcing industrial safety and health prior to the Minimum Requirements in 1943, the following uncontroverted facts also appear in the record. In the sample contracts the parties have stipulated were representative of those utilized during the relevant time period, Bethlehem, as contractor, agreed to abide by and enforce federal labor safety standards. The contracts themselves do not provide that the government assumed any duty during the relevant period to ensure the safety and

health of Bethlehem's employees. The record indicates further that Bethlehem had visible and active safety and medical personnel during the times at issue, whereas the United States had no health or safety representatives at the Shipyard.

Prior to 1943, the date the Minimum Requirements were adopted, documents admitted into evidence show that the United States authorized the Massachusetts Department of Labor and Industries (DLI) to conduct safety and health compliance reviews under federal as well as state law. The first such agreement between the government and the Commonwealth of Massachusetts, effective June 1, 1941, called for cooperation between the relevant federal and state agencies so as to reduce inefficient overlap of resources. In the later agreements covering the pertinent time period, beginning with one effective November 10, 1942, the Administrator of the Wage and Hour and Public Contracts Division, pursuant to Administrative Order 103 promulgated by the Secretary of Labor, designated the Massachusetts DLI "as the sole agent to inspect plants in Massachusetts subject to the [Walsh-Healey] [2] Act and to determine compliance with" its safety and health provisions, which are codified at 41 U.S.C. § 35(e). Section 4 of the Walsh-Healey Act, 41 U.S.C. § 38, specifically provided that the Secretary of Labor, with the consent of the state, could utilize state employees in the administration of the Act, a point recited in the 1942 agreement. That agreement further authorized the State

> to notify employers that violation of State safety, sanitation, and health laws constitutes violation of [the Walsh-Healey] Act. The Massachusetts Department of Labor and Industries assumes responsibility for making such inspections and for enforcing State safety, sanitation, and health requirements in all such plants. Listing a company as ineligible for [Federal] Government contracts

---

**2.** See *infra* at 290 nn. 4–5 for the pertinent language of the Walsh-Healey Act, which is codified at 41 U.S.C. §§ 35–45.

shall be done solely by the [U.S.] Secretary of Labor.

The Minimum Requirements for Safety and Industrial Health in Contract Shipyards were promulgated after Shuman left the Shipyard in December 1942. The Requirements originated in a national conference held in 1942 under the joint auspices of the Navy and the Maritime Commission, at which experts in occupational health and safety discussed with shipyard representatives from across the country appropriate health and safety standards for the shipyards. The shipyards were requested to send representatives from their medical and safety departments and from their labor management committees, and did so. The medical chief of Bethlehem's Fore River Shipyard was among the representatives at the meeting. The document produced by the conference was unanimously agreed to by all the representatives present from the shipyards. Within two months thereafter, the proposed standards were approved by both the Secretary of the Navy and the Chairman of the Maritime Commission.

The Requirements' compliance structure is set forth in a letter from these two government officials to contracting shipyards. This letter was printed at the beginning of the booklet containing the Minimum Requirements which was disseminated to contracting shipyards. The letter states that "safety and industrial health consultants will be made available in all regions wherein [contracting shipyards are located]," and continues:

> Each contractor is hereby given notice that the Navy Department and the Maritime Commission will expect full and complete compliance with the minimum standards which bear the approval of the Navy Department and the Maritime Commission, and each is requested to give full cooperation to the consultants on safety and health who will be charged with the coordination and supervision of the safety and health programs of the two agencies.

> The cumulative restriction of manpower makes speedy attention and comprehensive action in respect to the subject matter hereof of vital importance.

The record shows that shortly after the promulgation of the Minimum Requirements, several compliance surveys of the Fore River Shipyard were completed. Suggestions for remediation were thereafter made to the Shipyard management. Although the Requirements included standards for the safe use of asbestos and the measurable airborne levels in an area of work which would mandate the use of respirators and ventilation equipment, no notation was made in the surveys regarding the use or nonuse of respirators, or of any deviations from the standards in the handling of asbestos products. The first of these surveys was made several months after Shuman left his first period of work with the company.

At the time Shuman returned to the Shipyard in 1953, it appears that shipyard compliance with the Minimum Requirements was no longer urged by the Navy and Maritime Commission. In a memorandum dated August 27, 1945, entitled "Cancellation of Safety and Health Program," the Director of Shipyard Labor Relations in the Maritime Commission detailed a plan to discontinue "all safety and health work ... as of October 1, 1945." All safety and health experts who were paid to advise the government on shipyard safety during World War II, including those who had drawn up the Minimum Requirements, apparently had their contracts terminated.

The next foray of the government into matters of shipyard workers' safety and health, as far as the record shows, was by way of a regulatory program created by statute rather than by executive action. The 1958 Amendments to the Longshore and Harbor Workers' Compensation Act, codified at 33 U.S.C. § 941, were passed and became effective after Shuman had departed from his second and final employment period at the shipyard. According to the Report from the House Committee on Education and Labor, the purpose of this

set of amendments was "to provide a system of safety rules, regulations, and safety inspection and training, and authorize their enforcement by the Secretary of Labor. It is designed to bring about a greater degree of safety in the [ship repair and stevedore] industry [3] and reduce the very high rate of injury which at the present time is approximately seven times higher than the injury rate in manufacturing activities." H.R. Rep. No. 2287, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Ad. News 3843, 3844.

Before turning to assess the discretionary function exception of the FTCA in this context, we quote the district court's other findings pertinent to our disposition of the case:

(8) As late as 1945, Bethlehem Steel had not adopted conventional safety measures at the Shipyard to protect workers from the hazards of asbestos dust, such as use of respirators and ventilation for workers involved with pipe covering.

(9) Although the Navy could not mandate changes in working conditions, Naval officials stationed at the Shipyard had authority to request improvements in working conditions, such as use of respirators and installation of proper ventilation. It is highly likely that these changes would have been made had the Navy requested such changes.

(10) The Navy did not take significant steps to improve the conditions of workers exposed to asbestos dust despite actual knowledge of the open and obvious nature of the hazard, nor did it provide effective warnings to them.

(11) Adoption of conventional safety standards would not have involved significant costs or significant delay to the war effort. The promulgation of the "Minimum Requirements" demonstrates that the Navy itself believed that there was no conflict between national security and occupational safety.

(12) Adoption of conventional safety procedures, such as the use of respirators, probably would have prevented Shuman's mesothelioma. In coming to this conclusion, I rely on the fact that Shuman's job did not require him to spend extended periods of time in the shop where workers cut and shaped asbestos.

## FTCA and the Discretionary Function Exception

In an action brought against the United States under the Federal Torts Claims Act (hereinafter FTCA), damages may be obtained

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). This provision is further elaborated in § 2674, where Congress clarified that the liability of the United States for tort claims is to be judged "in the same manner, and to the same extent as a private individual under like circumstances...."

As often noted, and most recently in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* —— U.S. ——, 104 S.Ct. 2755, 2763, 81 L.Ed.2d 660 (1984), "[t]he Act did not waive the sovereign immunity of the United States in all respects ...; Congress was careful to except from the Act's broad waiver of immunity several important classes of tort claims." One such exception, 28 U.S.C. § 2680(a), provides that the FTCA does not embrace

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a

---

**3.** Shipyards that were not shiprepairers and were involved only in shipbuilding were evidently not covered under the LHWCA and subject to its safety requirements until passage of the 1972 Amendments to the LHWCA. *See* 33 U.S.C. § 903(a).

statute or regulation, whether or not such statute or regulation be valid, *or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.* [Emphasis added.]

As the Court pointed out in *Varig Airlines,* the "discretionary function exception ... marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain government activities from exposure to suit by private individuals." 104 S.Ct. at 2672.

Although the Court's interpretation of the discretionary function exception "admittedly has not followed a straight line," *id.* at 2674, we believe that the Court's unanimous opinion in *Varig Airlines* signaled that a more uniform and linear approach was to be utilized henceforth. *Accord General Public Utilities Corporation v. United States,* 745 F.2d 239 (3d Cir.1984) (after *Varig,* "our canvas of authorities is accordingly narrow"). In particular, the Court teaches that

> [f]irst, it is *the nature of the conduct, rather than the status of the actor,* that governs whether the discretionary function exception applies in a given case. As ... in *Dalehite* [v. *United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) ], the exception covers "[n]ot only agencies of government ... but all employees exercising discretion." 346 U.S. at 33 [73 S.Ct. at 966]. Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

*Varig Airlines,* 104 S.Ct. at 2765 (emphasis added). Second, the Court has admonished that

> whatever else the discretionary function exception may include, *it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals....* [The congressional] emphasis upon protection for regulatory activities suggests an underlying basis for the inclusion of an exception for discretionary functions in the Act: Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.

*Id.* (emphasis added).

In reaching this conclusion, the Court reviewed the legislative history of the FTCA, and its prior case of *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), at some length before turning to analyze the features of the Federal Aviation Administration's regulatory scheme which was at issue in *Varig. Dalehite* was a test case against the United States for damages for the death of a man which resulted from a major disaster occurring in a Texas port. A large quantity of fertilizer had exploded shortly after being loaded aboard ship, and the port was leveled, killing a number of people. No single government employee was charged with negligence, but the government itself was alleged to have committed numerous acts of negligence, including the cabinet level decision to institute the fertilizer program, the failure to conduct additional experimentation on the possibility of explosion, deficiencies in the drafting of the plan for manufacture, and the failure to supervise properly the loading and storage of the fertilizer aboard the ships.

█ In *Dalehite,* the Court identified some of the contours of the discretionary function exception. It clarified that "discretionary function or duty" embraces more than merely the initiation of programs and activities; it also includes determinations made by executives and administrators in establishing plans, specifications or schedules of operations. "Where there is room for policy judgment and decision

there is discretion. It necessarily follows that the acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." *Dalehite*, 346 U.S. at 35–36, 73 S.Ct. at 967–968. *Dalehite* emphasized that this is so, even where acts of negligence are committed on the policymaking level. Lack of due care in promulgating a policy, or in having no policy or program at all on an issue, however imprudent it might seem, is encompassed within the discretionary function exception. *See id.* at 37–47, 73 S.Ct. at 969–974.

■ We believe that *Dalehite* as reaffirmed in *Varig Airlines* provides the guiding principles for the determination of the case before us. Turning first to the complaint, we find that the plaintiff alleges that the government

> was under a duty imposed by [the Walsh-Healey Act, 41 U.S.C. §] 35(e)[4] to warn the deceased that it was dangerous or hazardous to his health and safety to engage in work requiring the use of asbestos; that the government did not so warn the deceased or make any orders or regulations governing said employment so as to make it safe.

The first answer to this allegation is that Congress has structured into § 4 of the Walsh-Healey Act a great deal of administrative discretion. Section 4 of the Act,[5] 41 U.S.C. § 38, creates the regulatory, investigatory and prosecutorial apparatus and powers of the Department to enforce § 35(e). The government's omission of a policy requiring the Federal Department of Labor, or others acting under its authority, to warn the endangered workers themselves of a work hazard was a discretionary act protected by the discretionary function exception to the FTCA. Similarly, the omission of a government directive authorizing the federal government "to make [the workplace] safe" during the times plaintiff's decedent worked at the shipyard is nonactionable; it lies within the realm of protected discretion.

The second answer to plaintiff's claim is that § 35(e) did not impose a set of explicit, enforceable obligations on the government running to employees of government contractors. A product of its time, enacted decades prior to the Occupational Safety and Health Act, Walsh-Healey merely required that government contractors stipulate in their contracts with the government that they would not, *inter alia*, subject their employees working on government projects to hazardous substances. The promise is made by the contractor to the government, not by the government to the contractor's employees. *See Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127, 60 S.Ct. 869, 877, 84 L.Ed. 1108 (1940) ("Government may for the purpose of keeping its own house in order lay down guide posts by which its agents are to proceed in

---

4. Section 35(e) provides that "[i]n any contract made and entered into" by the United States for the manufacture and furnishing of materials exceeding $10,000, the following representations shall be made:

> (e) That no part of such contract will be performed nor will any part of the materials, supplies, articles or equipment to be furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of said contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

41 U.S.C. § 35(e).

5. Section 4 provides:

> The Secretary of Labor is authorized and *directed to administer* ... [the Walsh-Healey Act] and to utilize such Federal officers and employees and, with the consent of the State, such State and local officers as he may find necessary to assist in the administration of said sections and *to prescribe rules and regulations with respect thereto.* ... The Secretary of Labor ... shall have power to make investigations and findings as provided in [the Act], and prosecute any inquiry necessary to his functions.... The Secretary of Labor *shall have the authority from time to time to make, amend, and rescind rules and regulations* as may be necessary to carry out the provisions of [the Act].

41 U.S.C. § 38 (emphasis added) (enacted in 1936 and remains in all substantive aspects identical to the original language).

the procurement of supplies, and *which create duties to the Government alone.* It has done so in [this] Act. The Act ... embodies the traditional principle of leaving purchases necessary to the operation of our Government to administration by the executive branch ... with adequate range of discretion....").

In Walsh-Healey, one of the first federal attempts to upgrade employment conditions, Congress etched out an area where democratic political processes could make a significant impact. Broad discretionary rulemaking and enforcement powers were vested in the Secretary of Labor who is politically accountable both to the Congress and to the President who appointed her. Because of the discretion structured into the Act, the kind and the quality of enforcement of contractor compliance will vary, and this appears to be precisely the outcome Congress desired under this Act. Plainly, whether the government should have undertaken a duty to warn a government contractor's employees about the hazards of working with asbestos during the relevant time periods is a matter that falls within the protection of the discretionary function exception.

But the district court did not base its judgment for Shuman on any negligence of the United States in enforcing the Walsh-Healey Act, as alleged in the complaint. Rather, it held that because Shuman was an employee protected by the LHWCA, and the United States was the owner of the majority of the ships on which he worked during the relevant periods of time,[6] Shuman had properly brought a negligence suit against the United States in its capacity as a shipowner pursuant to 33 U.S.C. § 905(b). The court then turned to *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), for a description of the duty owed by a vessel to the employees of third-party contractors. Noting that three opinions were filed in *Scindia*, no one of which received majority support, the dis-

trict court stated that even the "most restrictive view of the vessel owner's liability, as expressed in Justice Powell's opinion, covers the situation here where the Navy was in fact engaged in more or less daily inspection, and had actual knowledge of the dangerous condition, the danger was clear and continuing and the contractor was 'obviously improvident.' 451 U.S. at 180 [101 S.Ct. at 1628]."

We believe that the district court committed the same error in this case as did the district court in *Dalehite*. In *Dalehite*, the district court attempted to hold the United States to common law standards of negligence, the same standards that would apply to any negligent manufacturer of fertilizer that had exploded and caused damages. In so ruling, that court mischaracterized the source of the alleged errors or negligence. The Supreme Court pointed out that the decision to manufacture the fertilizer, in order to feed the people in the vanquished United States-occupied countries in the aftermath of World War II and thus lessen the danger of internal unrest, was a matter of cabinet-level government policy. The possibility of dangerous explosions resulting from fertilizer made from ingredients formerly used for explosives was known and a decision was made to produce the fertilizer despite the risk. The petitioners in *Dalehite* advanced an argument to the Court that is analogous to plaintiff's in this case:

> [t]he negligence involved here was far removed from any Cabinet decision to provide aid to the Germans and the Japanese.... It is directed only to the mistakes of judgment and the careless oversight of Government employees who were carrying out a program of manufacturing and shipping fertilizer and who failed to concern themselves as a reasonable man should with the safety of others.... Congress delegated to Ordnance no 'discretion' thus to commit wrong.

**6.** Whether the United States owned the ships for purposes of the 33 U.S.C. § 905(b) analysis is a contested finding of fact which we do not review, given our disposition of the case.

*Dalehite,* 346 U.S. at 35, 73 S.Ct. at 967. The Court rejected this argument, stating that the

> acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

*Id.* at 36, 73 S.Ct. at 968.

In the case before us, plaintiff also charges the United States with negligence on the official policy level, although she, too, mischaracterizes it as operational negligence, *i.e.,* as though the choice of an inspection policy had been made and that it was merely negligently implemented. As was also true in *Coastwise Packet Co. v. United States,* 398 F.2d 77, 80 (1st Cir.), *cert. denied,* 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274 (1968), however, "[t]his is not a case where plaintiff's [decedent] suffered damage from the negligent performance of an act the [Navy] had undertaken after policy had been established, *Indian Towing Co. v. United States* [350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) ], but, at best,

so far as plaintiff was concerned, is one" where the negligent acts charged occurred on the policymaking administrative level.

As already noted, when Shuman first worked at the shipyard in 1942 the government had not promulgated any minimum safety standards for the use and handling of asbestos in contracting shipyards. The official policy at this time was not to regulate "the conduct of private individuals," *Varig Airlines,* 104 S.Ct. at 2765, regarding the use of asbestos or other hazardous substances. Thus, despite the district court's express finding that "upper echelon Navy officials knew at least as early as 1940, and probably earlier, that asbestos dust posed a significant health hazard," the omission of regulations and an enforcement apparatus designed to minimize occupational hazards in the shipyards was a matter of administrative, and perhaps even legislative, discretion protected by the discretionary function exception. Similarly, the Navy decision to provide technical inspectors on site to test for quality control and adherence to government plans and specifications, and not to provide inspectors with authority for promoting or ensuring the safety and health of the government contractor's employees, was a matter of protected discretion.[7] That the Navy and

---

7. After Shuman's departure from the shipyard in 1942, the government became somewhat more involved in safety and health matters in contracting shipyards, largely to accelerate the production of ships for the war. Nonetheless, the level of enforcement responsibility vested in SUPSHIP falls below the level necessary to ground any claim of operational negligence by SUPSHIP. In a document entitled "The Navy's Participation in the Navy-Maritime Joint Project for Safety and Industrial Health in Contract Shipyards," dated December 13, 1943, a list of the most frequently-asked questions about SUPSHIPS' role in the implementation of the Minimum Requirements is included with answers from the Navy's Bureau of Ships (BUSHIPS). Question 3 is especially relevant to our determination of this case:

> Would it be possible for the Assistant Supervisor of Ships [part of SUPSHIP] in the yard to aid the [contracting shipbuilder's] Safety Department in getting sections of the Minimum Requirements not now in effect, complied with where management is opposed or disinterested?

> Safety Directors often would welcome such cooperation but cannot initiate such action as it might affect their standing with management and jeopardize their positions.
> *Buships Comment*
> The Supervisors of Shipbuilding will act in all matters directly or indirectly affecting the performance of the work under the contracts. The Supervisors will *not* act in the role of or on account of "Safety Directors," if the latter individuals are backward in handling their own managements.

In response to a related question, BUSHIPS replied, "The Supervisors of Shipbuilding will not undertake to do the work of the management. They are limited in their duties to the inspection of all work under the contracts only."

Question 7 asks: "Do any of [the] contracts stipulate that the yard is to comply with the Minimum Requirements?" BUSHIPS responded in part:

> None of our contracts compel compliance with the so-called "Minimum Requirements." The Bureau does not believe that those matters should be made contractual at this time,

Maritime Commission promulgated the Minimum Requirements after Shuman left employment at the Shipyard and rescinded them prior to his return does not mean that the Government can be held accountable in tort for negligence because it did not have an operative safety policy during the period of time that might have been helpful to plaintiff's decedent. Nor can the existence of standards during one period of time ground a negligence claim under a theory that the standards should have been promulgated earlier, or maintained for a longer time, or been more stringent in their substantive requirements or enforcement. The timing and provisions of standards are the very essence of policy discretion.[8]

Moreover, review of the Navy's Minimum Requirements and its compliance structure compels the conclusion that it was basically an advisory and educative program for contracting shipyards so as to augment the war effort. The Secretary of the Navy charged the shipyards to provide "full and complete compliance" with the standards, and *requested* [them] to give full *cooperation to [government] consultants* on safety and health" (emphasis added) administering the program. The advisory and educational role of the Navy is best exemplified in the documents memorializing the December 7, 1942 conference held to discuss the standards with shipyard representatives prior to their promulgation. Mr. Daniel Ring, Chief of Shipyards Labor Relations for the United States Maritime Commission, convened the meeting. In his introductory remarks, Mr. Ring complimented the shipbuilding industry on "mov[ing] directly into cooperation and focus[ing] itself and its attention on two very specific problems that they have." After reminding the representatives that they were meeting on the first anniversary of the bombing of Pearl Harbor, Mr. Ring noted that:

since the "Minimum Requirements" have not been sufficiently crystallized. Even when and if they are, the Bureau is not at all certain that the matter is one which should be included in a supply contract.

We are building the ships to take the ammunition and the supplies to the manpower of the nation, and it has been restricted and reduced in such a way that we must make sure that the farthest possible use must be made of every one of us who are able to work on the home front.

With that in view, we are dedicating this conference to the purpose of promoting the greatest individual efficiency in shipyards throughout the country. *Our whole objective is based upon production*, because everything else is subsidiary to that.... [Emphasis added.]

After presenting the day's agenda, and explaining the importance of the representatives' discussion and amendment of the proposed standards so that a consensus on them could be achieved, Mr. Ring noted:

Once that is done, it is intended that the Maritime Commission and the Navy Department promulgate those [standards] to all of the yards, and *ask* that in the interest of efficient production, those standards be adhered to.

. . . .

*We want you to understand that we do not intend to do this job ourselves. That is basically your job.* However, we do hope that *we can act in the role of coordinators and advisers.* We want to be there to help you do that job.

Now, ... we want it understood that the standards will be the product of your doing, your own conference right here. [Emphasis added.]

Following Mr. Ring's introductory remarks, Dr. Phillip Drinker of the Harvard School of Public Health, who had been appointed the government's chief advisor on shipyard occupational health issues, addressed the conference. He reemphasized Mr. Ring's comments, and concluded with the following:

8. As the Court observed, "When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Varig Airlines,* 104 S.Ct. at 2768.

Now, our job is to help you. *We will be available to come and see you and help you at anything that we can.* We have had a couple of requests from yards now to go back on specific investigations, to see the hazards which they thought that they had, or did have, and to help tell them ways of improving conditions, et cetera. That is what we are for, and that is what we are being paid for, and if you do not make use of us, or if you do not make us work for you, we will be self-liquidating and reassigned. That is what the organization is set up to do, and *if you do not make us work, then I think that that will be your fault.* We can do it, and we would like to do it. [Emphasis added.]

The district court, however, ruled *inter alia* that the "[a]doption of conventional safety standards would not have involved significant costs or significant delay to the war effort. The promulgation of the 'Minimum Requirements' demonstrates that the Navy itself believed that there was no conflict between national security and occupational safety." Although we agree with the court's assessment of what the better policy would have been, we must recognize that in *Varig*, the Court instructed that "Congress wished to prevent judicial "second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines*, 104 S.Ct. at 2765. This, we think, is the error the district court made in this case.

We draw support for our decision from two recent post-*Varig* decisions discussing the current parameters of the discretionary function exception. In *General Public Utilities Corp. v. United States*, 745 F.2d 239 (1984) the Third Circuit determined that an FTCA action by the owners of the Three Mile Island Nuclear Plant against the United States for allegedly failing to discover and warn of safety hazards and for negligently approving TMI's design was barred by the discretionary function exception. The court ruled that the exception leaves the means of accomplishing safety to the responsible agency which must make judgments as to priorities and funding under the circumstances. The court then noted:

That in hindsight the [agency's] judgment may have been ill-advised in no way changes the character of the function under scrutiny. The extent and scope of a [regulatory program and investigations thereunder] remain[ ] a matter of the agency's discretion. As this court stated in *Bernitsky v. United States*, 620 F.2d 948, 955 (3d Cir.1980), "Decision making as to investigation and enforcement, particularly when there are different types of enforcement action available, are discretionary judgments."

*Id.* at 244–45.

The Sixth Circuit has ruled similarly in a case even more on point. In *Feyers v. United States*, 749 F.2d 1222 (6th Cir.1984), the plaintiff was an employee of Chrysler Corporation which was an independent contractor in a government-owned railyard. He was injured in an accident involving coupling flatcars under Chrysler's supervision, but sued the government on the grounds that it "negligently inspected Chrysler's operation of the facility; ... negligently entrusted the flatcars to Chrysler; and ... breached its nondelegable duty to provide a safe work area." *Id.* at 1223. The court, relying on *Varig*, ordered dismissal of the complaint as barred by the discretionary function. The court held that

decisions to *delegate safety responsibility* to Chrysler, to *conduct only "spotchecks"* of Chrysler's safety programs, and *not to institute a safety program* for railyard workers are clearly the type of discretionary functions protected by 28 U.S.C. § 2680(a).

*Id.* at 1227 (emphases added).

We are not unmindful of the concerns expressed by Justice Jackson in his *Dalehite* dissent. He observed that

[t]he Government, as a defendant, can exert an unctuous persuasiveness because it can clothe official carelessness with a public interest. Hence, one of the unanticipated consequences of the Tort

Claims Act has been to throw the weight of government influence on the side of lax standards of care in the negligence cases it defends.

*Dalehite,* 346 U.S. at 50, 73 S.Ct. at 975 (Jackson, J., dissenting). But the Court has recently reviewed the legislative history of the FTCA and determined that Congress intended to protect the government from tort suits based on negligence that was the result of the exercise of governmental discretion, despite the magnitude of the injuries that flow therefrom.

*Reversed.*