Beverly Sue JONES, and Christopher Jones, a minor, by his next friend and natural guardian, Beverly Sue Jones, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. CV 86–0058, 87–0107–RSWL.

United States District Court, D. Hawaii.

July 29, 1988.

As Corrected Sept. 7, 1988.

Gail Killefer, Judith N. Macaluso, Charles Kruse, Asst. U.S. Attys., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEW, District Judge, Sitting by Designation.

Based on the evidence adduced at trial on July 7–25, 1988, the Court now enters the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. *Chlordane*

(1) Chlordane is a chlorinated cyclodiene insecticide. It was first described as an insecticide in 1945, and has been produced commercially in the United States since 1947. In 1981 and 1982, chlordane was a pesticide approved by the Environmental Protection Agency (EPA) for use against various species of subterranean termites; until 1987, chlordane was a general use pesticide and could be purchased by the public.

(2) The American Conference of Governmental Industrial Hygientists recommended 500 micrograms per cubic meter of air as the accepted maximum allowable limit in the occupation/industrial setting (8 hrs./day, 5 days/week) during the time frame relevant to this case. In 1979, the National Academy of Sciences (NAS) recommended a level of 5 micrograms per cubic meter of air not to be exceeded in the home.

(3) The Air Force has used chlordane as a termiticide since the 1940s. Through 1982, the pest control industry and the Air Force acknowledged chlordane as one of the four most effective termiticides, and the least acutely toxic of the four termiticides most commonly used. Chlordane is considered extremely potent and the most efficient termiticide because it remains in the soil for up to 30 years and does not migrate.

Dennis E.W. O'Connor, Reinwald, O'Connor, Marrack, Hoskins & Playdon, Honolulu, Hawaii, for plaintiffs.

B. *Department of Defense Pest Control*

(4) The Secretary of Defense established policy and guidance for pest management programs throughout the Department of Defense (DOD) with Directive 4150.7, "Department of Defense Pest Management Program," November 6, 1978. This Directive, which is still in effect, applies to all Defense Agencies and DOD components. The Directive, which governs pest control functions performed worldwide by DOD personnel and by contractors, states that DOD components "will establish and maintain effective, comphrensive, efficient, and environmentally sound pest management programs." DOD Directive 4150.7(D). Each program, "as a minimum," must, *inter alia,* allow only properly trained and certified personnel to apply or supervise the application of pesticides, "[u]se only registered pesticides," and "[e]stablish a pesticide monitoring program." *Id.* at §§ E(3)(a), (b), (g).

(5) The Secretary of Defense established the Armed Forces Pest Management Board (AFPMB), composed of medical entomology officers and other pest management professionals, to "[d]evelop and recommend policy to the Assistant Secretary of Defense (Manpower, Reserve Affairs and Logistics) for the DOD Pest Management Program described in DOD Directive 4150.7," and to "[s]erve as a scientific advisory body to the DOD Components [and] ... provide timely, scientific, and professional pest management advice...." DOD Directive 5154.12, "The Armed Forces Pest Management Board," July 23, 1979, at §§ C(1), (2).

(6) Two publications direct the Air Force pest management program: Air Force Manual (AFM) 91–16 and Air Force Regulation (AFR) 91–21. AFM 91–16, the Military Entomology Operational Handbook, was "prepared for the purpose of providing continuing guidance for the safe application of controls" (quoting Foreword to ARM 91–16), and provides specific information about pest management techniques and the pests themselves. Issued by order of the Secretaries of the services, the handbook pro-vides guidance to all Air Force entomology shops and pest control contractors on the methods, materials, and equipment necessary for pest control.

(7) AFR 91–21, "Pest Management Program," March 6, 1981, issued by the Secretary of the Air Force, states the policies, responsibilities, and the procedures for pest management at Air Force installations. This regulation states that the Air Force Engineering Service Center (AFESC) "develops and implements U.S. Air Force pest management policy and programs, and implements DOD pest management policies and directives." *Id.* § 2(b)(1). AFESC informs major commands (MAJCOMS) and installations of items pertinent to the Air Force Pest Management Program. *Id.* § 2(b)(2).

(8) Each year, the Base Civil Engineer on each Air Force installation must submit a Pest Management Plan to the MAJCOM entomologist outlining the pesticides that the installation plans to use in the coming year, and the amount, the use, and the application method of the pesticides. *Id.* § 9(a). Pursuant to AFR–21, the Director of Base Medical Services and the MAJCOM approved the use of chlordane for military family housing at Williams AFB and Wright–Patterson AFB in 1981 and 1982.

(9) On each base, the Base Civil Engineer is responsible for actual pest control through an in-house entomology shop or an independent contractor, who is monitored by a Quality Assurance Evaluator (QAE)— an Air Force employee whose responsibilities include evaluating a contractor's end product for each of the services specified in the contract. The QAE for pest control must also be a certified pesticide applicator.

(10) AFR 91–21 stated in 1981 and 1982 that units with subslab or intra-slab ducts would not be treated with an insecticide.

(11) Applicators of chlordane, today as in 1981 and 1982, are and were required by statute to follow the instructions printed on pesticide container labels. *See* 7 U.S.C. § 136j(a)(2)(G).

(12) In 1981 and 1982, there was no Air Force directive mandating that occupants

of military family housing be warned that their residence was, or would be, treated with chlordane.

(13) Any warning concerning chlordane would have been an integral part of the Air Force pest management program. There were many discussions within the Air Force and the Department of Defense (DOD) regarding what a safe level of chlordane in family housing was. The Air Force concern was with houses with subslab and intra-slab ductwork, which had the potential for accumulating the chlordane and then contaminating the living space when air was forced through the ductwork with the operation of the heat or air conditioning systems. The Air Force had no experience with the situation plaintiffs assert here—chlordane migrating through a crack in the slab into the housing unit without entering through the duct system.

(14) At the request of the Air Force and the Armed Forces Pest Management Board, the National Academy of Sciences (NAS) in 1979 recommended a guideline for chlordane in living quarters of 5.0 micrograms per cubic meter. The Air Force accepted this guideline as an "action level" in housing units. If chlordane exceeded this level, the Air Force would take action.

(15) The Air Force accepted the NAS guideline as an acceptable level of exposure. In adopting a policy premised upon this guideline, the Air Force did a risk/benefit analysis, weighing considerations such as the cost of constructing and repairing houses, relocating occupants, and the risk of exposing Air Force personnel to chlordane.

(16) During the Air Force program of air-sampling houses with sub or intra-slab ducting, the occupants of the houses sampled were informed that their unit had been treated with a termiticide, apprised of the health risk, and informed of the results of the air sampling in their home. If the sampling indicated that the chlordane level in the house exceeded the guideline, the Air Force took corrective action, including filling the route of entry—the duct work—with concrete and sealing it. The next occupants were not so advised, because the chlordane levels were within acceptable levels—with or without corrective action taken by the Air Force.

## C. *Plaintiffs*

(17) Beverly Jones was born on June 27, 1956, in Greenville, South Carolina to Patricia Gail Williams (now Fretz), born on April 25, 1940, and James S. Williams, who married in 1954.

(18) On April 1, 1978, after a general physical examination of Beverly, Dr. Nakano noted that Beverly Jones had a mild spastic paraparesis in her lower extremities, congenital anisocoria (an inequality of the diameter of the pupils), intermittent clonus of the ankles, some poorly coordinated movements on tandem walking, and a tendency toward a Babinski response on the right toe.

(19) Beverly married Robert Jones in 1980 in Hawaii.

(20) Robert and Beverly Jones reported to Williams Air Force Base in Arizona in February 1981. Robert Jones, who was beginning his Undergraduate Pilot Training (UPT), applied for military family housing and was placed on the waiting list. Robert Jones was offered a unit at 9667 Tennessee Place on March 23, 1981, which he accepted the following day.

(21) On March 30, 1981, Dr. Robert W. Sorgen, M.D., the Flight Surgeon, saw Beverly Jones, who complained of respiratory symptoms referable to allergies. She complained of frequent watering and burning of her eyes for the two months prior to her visit.

(22) On March 31, 1981, final inspection of 9667 Tennessee Place was performed, which Beverly Jones attended. She accepted the unit.

(23) On April 2, 1981, exterminators from Custodial Services Corporation (CSC), an independent contractor which provided pest control services for Williams Air Force Base, applied approximately 1 to 2 gallons of 1% (1 gallon of a 72% chlordane and 28% deodorized kerosene solution mixed with 99 gallons of water) chlordane to 9667 Tennessee Place. CSC applied the ½ to 1 gallon

of the 1% chlordane with a slab injector through each of two ¾″ holes drilled below the doorjambs, through the building foundation, at the front of the house. The chlordane, which was premixed, was pumped from a tank on the back of a truck through a hose, ½″ in diameter. The holes were immediately sealed with cement following the application. The heating and cooling ducts in this unit in 1981 were not sub- or intra-slab, and did not run under or through the floor of the residence. All personnel who treated this unit were certified as applicators by the State of Arizona. This chlordane application was conducted pursuant to standard procedures; no chlordane was sprayed inside the house.

(24) Beverly and Robert Jones moved into 9667 Tennessee Place, Williams Air Force Base, with various pets on April 4, 1981.

(25) Mrs. Jones made an appointment at the Flight Medicine Clinic for April 9, 1981. On that date, she complained to the Flight Surgeon, Dr. Sorgen, of a swollen face for five days. She also told the doctor that her house had recently been fumigated. Dr. Sorgen's diagnosis at that time was allergic contact dermatitis.

(26) On April 7, 1981, Captain David J. Seidel, the Chief of Bioenvironmental Engineering and Airman First Class Michael A. Vaughn, Environmental Health, went to 9667 Tennessee Place based on the Joneses' complaint of an insecticide smell. They recommended that the house be force ventilated for three days and said that they would then check to see if the odor still persisted.

(27) On April 10, 1981, Robert Jones appeared at the Flight Medicine Clinic, complaining of illness, nausea, and a face rash for one week. He also complained of an odor in his house. Based upon Lt. Jones' complaints, Dr. Sorgen, Vaughn and Seidel visited the Joneses' residence that day. The house was in disarray with many birds and bird droppings, and with an odor. Dr. Sorgen recommended to Base Housing that, as a precaution, the Joneses be moved to different quarters. His recommendation was based on the odor of the house and the

fact that it was contaminated with bird feathers, food and other debris.

(28) On Friday, April 10, 1981, Beverly and Robert Jones were tested at the AFB hospital. All test results were within normal limits. Blood was drawn for a psittacosis test to determine if the Joneses' birds were causing their illness. This test required a second sample within six weeks, but the Joneses did not return for a second sampling, and the test was not completed.

(29) On April 10, 1981, the Joneses moved, with their birds, to visiting officers' quarters (VOQ) until Monday, April 13, when they moved into transient living quarters (TLQ). On April 17, the Joneses were assigned to another on-base house, 9593 Hawaii Court, which they moved into on April 23, 1982.

(30) On April 21, 1981, Captain Seidel and two airmen from environmental health met Mr. and Mrs. Jones at 9667 Tennessee Place to test for any presence of chlordane with special apparatus from Brooks AFB. The results showed that the amount of chlordane, if any, in each sample was less than 4.04 ug/m3 (micrograms per cubic meter of air), which was the detection level of the equipment used. At the time, the National Academy of Sciences recommended 5 micrograms per cubic meter of air as the level not to be exceeded in the home.

(31) In June 1981, Robert Jones was dismissed from UPT because of academic and flying deficiencies. He was given an assignment at Wright–Patterson AFB in Ohio, and transferred there in August 1981.

(32) In September 1981, plaintiff Beverly Jones and her husband moved into 5275 Cobb Drive, Wright–Patterson Air Force Base. This unit, built in the 1950s, had been treated with a sub-slab injection of chlordane in 1972.

(33) Plaintiff Christopher Jones was born on February 22, 1982, at Wright–Patterson AFB Medical Clinic.

(34) Samples of the urine (obtained February 26, 1982), blood (February 26, 1982), and breast milk (February 25, 1982) of Bev-

erly Jones obtained at Wright–Patterson AFB hospital were analyzed by Smith Kline Clinical Laboratories. No chlordane was detected. The level of detection in each test was 20 ng/ml.

(35) On March 5, 1982, Howard Laboratories, Inc., a private laboratory in Dayton, Ohio, reported that its analysis of Beverly Jones' milk showed that the level of chlordane, if any, was less than 0.1 ug/L (ppb), which was the detection level of the equipment used.

(36) On April 28, 1982, Howard Laboratories reported a chlordane level of 10.8 ug/L (ppb) in Beverly Jones' milk, the meaning of which the laboratory explained to plaintiffs in a letter dated September 10, 1982. The letter stated that the laboratory used a method to indicate the presence of chlordane which did not positively prove that the compound detected was chlordane. "It is assumed that the customer understands this principle and that confirmation for legal purposes must be performed by [a different method] as on rare occasions will ... analyses [by the method used] be acceptable in a court of law."

(37) On December 15, 1982, Christopher was taken to the base hospital for an ear infection. He had a fever of 99.8 F and that night his temperature went up to 103 F.

(38) On December 17, 1982, Christopher experienced a seizure at home and was taken to the emergency room at Children's Medical Center. There, he was observed and released.

(39) On December 18, 1982, Christopher experienced another seizure and was taken to the emergency room at Children's Medical Center actively seizing. His temperature was 104 F. He spent the night in the hospital.

(40) On December 18, 1982, Robert Jones took a filter furnace sample to Howard Laboratories for chlordane testing. He learned the results of that sample in a telephone conversation with Dr. Howard that afternoon. He received the written results of this analysis on December 23, 1982.

(41) Robert Jones called the base commander on December 18, 1982, from the Children's Medical Center. Jones told the base commander that his son was having a seizure caused by chlordane exposure, and that Jones had received the results of a chlordane test which exceeded the permissible level for exposure to chlordane.

(42) On December 19, 1982, in response to Robert Jones' telephone call to the base commander, the Wright–Patterson Department of Bioenvironmental Engineering sent a team to 5375 Cobb Drive to test for the presence of chlordane.

(43) The team took five air samples, two furnace filter samples, one sample of furnace dust, and one food sample. Three of the five air samples as well as the filter, dust and food samples were sent for analysis to the Air Force's Occupational and Environmental Health Laboratory (OEHL) at Brooks Air Force Base in San Antonio, Texas. The remaining two air samples were sent to Howard Laboratories in Dayton, Ohio for analysis.

(44) The Entomology Unit at Wright–Patterson AFB treated all termite problems on base by treating the soil where subterranean termites nest; chlordane would not be applied by spraying a roof. It was also unlikely that chlordane would be applied at Wright–Patterson AFB, Ohio, in December, because of that month's cold weather.

(45) On December 20, 1982, Christopher was discharged from the Children's Medical Center. The doctor's discharge diagnosis for Christopher was: "roseola infantum.febrile seizure."

(46) On February 14, 1983, Lt. Col. Wiley Taylor issued a report on the testing of plaintiffs' residence done by Wright–Patterson AFB bioenvironmental engineers on December 19, 1982. The report found that all samples were well below the permissible level recommended by the National Academy of Sciences. The testing results were as follows:

a) Air samples (# 1, 3 and 4) analyzed by the Air Force OEHL contained chlordane levels, if any, of less than 0.05 micrograms of chlordane per cubic

meter of air (ug/m3), the detection level of the equipment;

b) Air samples (# 2 and 5) analyzed by Howard Laboratory contained chlordane levels of 0.339 ug/m3 of air and 0.382 ug/m3 of air;

c) The two furnace filters were analyzed by the Air Force OEHL to have 10.53 and 11.67 micrograms of chlordane per gram (ug/g) of filter;

d) Dust from the furnace filter was analyzed by the Air Force OEHL to have 6.108 ug/g of dust; and

e) No chlordane was detected by the Air Force OEHL in the biscuit. The detection level of the equipment was 0.02 ug/g.

(47) The evidence did not show that these chlordane levels were inconsistent with chlordane levels found in samples taken from other houses which had been treated with chlordane in the past.

(48) On March 31, 1983, plaintiffs filed an administrative claim for alleged exposure to chlordane at 9667 Tennessee Place, Williams AFB, Arizona on April 2, 1981.

(49) On December 20, 1984, the Joneses filed their second administrative claim, alleging chlordane exposure on or about December 19, 1982, at Wright–Patterson AFB.

(50) Since 1978, Beverly Jones has received medical treatment or advice from at least 75 treating physicians, 2 psychologists, and 1 psychiatrist. She has complained of at least 70 different adverse health conditions.

## II. CONCLUSIONS OF LAW

(1) Plaintiffs brought this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680. The Act limits federal tort liability to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

(2) The FTCA is a limited waiver of sovereign immunity which defines the terms, conditions, and scope of the sovereign's consent to tort suits for money damages.

The court's jurisdiction under the FTCA is subject to certain enumerated prerequisites and exceptions. Claims which fall within an exception to the FTCA are by definition outside the Act's waiver of sovereign immunity, and thus are outside the court's jurisdiction. *See Mitchell v. United States,* 787 F.2d 466, 468 (9th Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 163, 98 L.Ed.2d 118 (1987).

■ (3) Moreover, the United States cannot be held strictly liable. *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). The FTCA has waived sovereign immunity only for "the negligent or wrongful act or omission" of government employees. 28 U.S.C. § 1346(b).

■ (4) Among the reservations of sovereign immunity found in the FTCA is the discretionary function exception, 28 U.S.C. § 2680(a), which provides that the waiver of sovereign immunity does not encompass claims based upon an exercise or performance, or failure to exercise or perform, a discretionary function or duty, whether or not the discretion involved is abused. The discretion Congress sought to protect in § 2680(a) is "the discretion of the executive or the administrator to act according to one's judgment of the best course...." *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The Supreme Court further explained that the exception protects the discretionary judgments of federal employees regardless of their title, rank or place in the bureaucratic hierarchy. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 1764, 81 L.Ed.2d 660 (1984). Recently, the Court made plain that the "discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz v. United States,* — U.S. —, 108 S.Ct. 1954, 1960, 100 L.Ed.2d 531 (1988).

(5) The decision of the Air Force to approve the use of chlordane involved a weighing of the needs of effective and economical pest control against the need to keep any contamination of the environment to a minimum. It is thus the type of administrative decision "grounded in social, economic, and political policy" that § 2680(a) insulates from judicial "second-guessing." *See Varig Airlines*, 467 U.S. at 814, 104 S.Ct. at 2765. Because the decision to use chlordane involved the balancing of economic, environmental, strategic, health and safety concerns, the discretionary function exception protects the government's decision to use chlordane at Williams AFB and Wright–Patterson AFB. *Jones v. United States*, Nos. 86–0058, 87–0107 (D.Hawaii March 9, 1988 and May 6, 1988).

(6) The decision by the Air Force to utilize and rely upon an independent contractor for pest control at Williams AFB clearly involved policy judgments. The degree to which the government monitors compliance with its regulations is a discretionary function. *Varig Airlines*, 467 U.S. at 815–16, 104 S.Ct. at 2765–66. Therefore, like the Federal Aviation Agency's (FAA) system of "spot-checking" airplanes for compliance with FAA regulations, at issue in *Varig Airlines*, the decision of Williams AFB to give CSC primary responsibility for safety in pest control, while only retaining oversight authority, is protected by the discretionary function exception. *See In re Consolidated Atmospheric Testing Litigation*, 820 F.2d 982, 995–96 (9th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988). Similarly, the acts of the Air Force employees in executing the system of inspecting chlordane applications at Williams AFB are shielded from tort liability. *Jones v. United States*, Nos. 86–0058, 87–0107 (D.Hawaii March 9, 1988).

(7) The Ninth Circuit has explained that formulating and issuing warnings requires the government "to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." *In re Consolidated United States Atmospheric Test-*

*ing Litigation*, 820 F.2d at 998, (citing *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2767). Moreover, "if the decision to issue or not to issue a 'warning' is within the discretionary function exception, then logically the failure to consider whether to issue one necessarily falls within the exception as well." *Id.* at 998–999. *See Begay v. United States*, 768 F.2d 1059 (9th Cir. 1985) (government's decision not to warn uranium miners of the dangers of radiation exposure involved the weighing of public policy and was, therefore, a discretionary function). *See also Allen v. United States*, 816 F.2d 1417 (10th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988) (section 2680(a) protected Atomic Energy Commission's failure to require closer supervision and to disseminate more public information in its execution of federal atomic bomb tests); *Barnson v. United States*, 816 F.2d 549 (10th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987) (decisions of Atomic Energy Commission and Public Health Service not to warn miners of radiation hazards and not to regulate the safety and health of miners were discretionary); *Shuman v. United States*, 765 F.2d 283 (1st Cir.1985) (Navy's decision to allow contractor to enforce safety standards and the Navy's failure to promulgate policies requiring a safety warning to workers were protected activities); *General Public Utilities Corp. v. United States*, 745 F.2d 239 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1227, 84 L.Ed.2d 365 (1985) (no liability for Nuclear Regulatory Commission's failure to warn of possible equipment defects at the Three Mile Island nuclear facility).

(8) There was no requirement at Williams AFB requiring that occupants be warned when chlordane was to be applied to their homes. Any warning to the Joneses in this case would have been an integral part of the Air Force pest management program. Because there was no statute or regulation requiring that occupants be warned that their house was to be treated with chlordane, any such warning would have been purely an act of discretion on the part of the Air Force at Williams AFB.

The fact that the Joneses were not warned regarding chlordane was also an exercise of discretion, even if such a warning was not considered. *See In re Consolidated United States Atmospheric Testing Litigation,* 820 F.2d at 998–999; *Shuman v. United States,* 765 F.2d 283, 290 (1st Cir. 1985). In sum, the decision of the Air Force not to warn plaintiffs that their house was treated with chlordane involved the permissible exercise of policy judgment and is shielded from tort liability by § 2680(a). *See Berkovitz v. United States,* — U.S. —, 108 S.Ct. 1954, 1960, 100 L.Ed.2d 531 (1988). Accordingly, plaintiffs' claims fall squarely within the discretionary function exception, and this Court is without subject matter jurisdiction. Plaintiffs' claims are, therefore, barred as a matter of law.

(9) The Court defers ruling upon the statute of limitations issue at this time because the record in its present state is inadequate.

■ (10) The FTCA permits parties to sue the United States for personal injury caused by the negligence of any government employee, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the [negligent] act ... occurred." 28 U.S.C. § 1346(b). Since the negligent acts of which plaintiffs complain purportedly occurred at both Williams Air Force Base (Arizona) and Wright–Patterson Air Force Base (Ohio), the Court must look to the law of Arizona and Ohio respectively to determine the standard by which the government's conduct must be judged. *See Mandel v. United States,* 793 F.2d 964 (8th Cir.1986); *Washington v. United States,* 769 F.2d 1436 (9th Cir.1985).

(11) In order to establish the government's liability in this case under Arizona law, the plaintiffs were required to prove the elements of an action for negligence, which are a duty owed to the plaintiff, a breach thereof and an injury proximately caused by the breach. *Markowitz v. Arizona Parks Board and State of Arizona,* 146 Ariz. 352, 706 P.2d 364 (1985); *Wisener*

*v. State,* 123 Ariz. 148, 598 P.2d 511 (1979). *See also Robertson v. United States,* 382 F.2d 714 (9th Cir.1967). Arizona law imposes on landlords the "duty to take those precautions for the safety of the tenant as would be taken by a reasonably prudent man under similar circumstances." *Cummings v. Prater,* 95 Ariz. 20, 26, 386 P.2d 27, 31 (1963). The extent of the landlord's duty to warn a tenant of the dangerous condition should be measured against the unreasonableness of the danger. *Id.* In this case, plaintiffs failure to prove the existence of a risk which would give rise to a need to warn.

(12) Plaintiffs also failed to prove a breach of duty. The United States exercised those precautions for the safety of its tenants, the Joneses, as would be taken by a reasonably prudent man under similar circumstances. *Id.*

(13) In order to establish a claim for negligence under Ohio law, a plaintiff must show: (1) duty; (2) breach of duty; (3) injuries; and (4) proximate causation between breach of duty and injuries suffered. *Keister v. Park Centre Lanes,* 3 Ohio App.3d 19, 443 N.E.2d 532 (1981); *Strother v. Hutchinson,* 67 Ohio St.2d 282, 423 N.E.2d 467, 469 (1981). Similarly in Ohio, plaintiffs failed to prove that the United States owed them a duty to warn. The evidence showed that the United States acted reasonably, particularly in light of the dearth of proof that chlordane was applied to the Joneses' residence in December 1982. Plaintiffs failed to prove that there was an application of chlordane at their Ohio home in December of 1982.

■ (14) Under Arizona and Ohio law, plaintiffs were required to prove that the injury complained of, and the damages sought, are the "direct, proximate, and probable result of the wrong." *Lavelle v. Owens–Corning Fibreglas Corp.,* 30 Ohio Misc.2d 11, 30 Ohio B.R. 223, 507 N.E.2d 476 (1987), citing 30 Ohio Jurisprudence 3d (1981) 24, Damages, Section 14. A plaintiff must provide evidence which specifically reflects that his illnesses causally relate to the alleged negligent act with a reasonable degree of medical probability. *Brandt v.*

*Mansfield Rapid Transit, Inc.*, 153 Ohio St. 429, 92 N.E.2d 1 (1950)); *Butler v. Wong*, 117 Ariz. 395, 573 P.2d 86 (1977).

(15) Plaintiffs failed to establish by a preponderance of the evidence that their alleged injuries were causally related to chlordane or a failure to warn.

(16) The testimony of plaintiffs' expert witnesses on causation—who relied upon an odor detected in plaintiffs' residence, plaintiffs' symptoms, and traces of chlordane in their bodies, to establish a causal relationship—was not credible. The basis of these opinions was very questionable: the opinions were predicated upon a belief of the existence of dangerous levels of chlordane, and nothing more. Accordingly, plaintiffs have failed to prove that chlordane was the proximate cause of any of their alleged injuries.

(17) Plaintiffs do not claim that Christopher Jones presently suffers any physical injury from chlordane exposure. Damages for diseases or injuries which have not yet manifested themselves are not recoverable under either Arizona or Ohio law. *See Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28 (App.), *petition for review granted on Issue No. 3 and denied as to other issues*, No. CV 88–0056–PR (April 26, 1988); *Destories v. City of Phoenix*, 154 Ariz. 604, 744 P.2d 705 (App. 1987); *Lavelle v. Owens–Corning Fibreglas Corp.*, 30 Ohio Misc.2d 11, 30 Ohio B.R. 223, 507 N.E.2d 476 (1987); *Clutter v. Johns–Manville Sales Corp.*, 646 F.2d 1151, 1157–58 (6th Cir.1981) (applying Ohio law). Furthermore, recovery for future injuries, or fear of such injuries, is only available legally where a present injury exists. Because plaintiffs have proved no present injury to Christopher, there can be no recovery for future injury, or fear thereof.

(18) Because of the ruling on causation, the Court finds it unnecessary to decide whether Beverly Jones suffered injuries. The testimony presented by plaintiffs on this issue was, however, inherently suspect.

For these reasons, it is ORDERED that plaintiffs' claims are dismissed with prejudice.