HAROLD D. HERSUM, ADMINISTRATOR
ESTATE OF HELEN D. HERSUM
*vs.*
KENNEBEC WATER DISTRICT

HAROLD D. HERSUM
*vs.*
KENNEBEC WATER DISTRICT

Kennebec.   Opinion, October 19, 1955.

*Perkins, Weeks & Hutchins,* for plaintiff.

*Dubord & Dubord,* for defendant.

SITTING: FELLOWS, C. J., WILLIAMSON, WEBBER, BELIVEAU, TAPLEY, CLARKE, JJ.

WEBBER, J.   On exceptions to rulings of referees and to the acceptance of their report. Two cases are here considered together. In one the plaintiff as administrator of his daughter's estate was awarded damages under two counts, one for her conscious pain and suffering and the other for pecuniary loss to her heirs as the result of her

death. In the other case plaintiff was awarded damages for the medical and hospital expenses incurred by him for his daughter and for the destruction of his home and furnishings. No issue is here raised as to the amount of damages.

The referees had before them evidence which would support the following findings of fact. The defendant, Kennebec Water District, is engaged in the business of supplying water in the City of Waterville by means of underground pipes, many of which are laid under existing streets. On April 16, 1953, the defendant had occasion to lay a new water main along Dalton Street upon its southerly side and in close proximity to defendant's old main. The defendant was aware that the Waterville Gas Company also maintains underground pipes as a part of its business of supplying gas. Before starting any excavation of the street, the defendant requested the gas company to furnish assistance by indicating the location of its concealed pipes. Two employees of the gas company went to Dalton Street to supply the requested information. The plaintiff's home was on the northerly side of Dalton Street. Almost directly across the street on the southerly side was the Millett home, which was adjoined on its westerly side by the Kennison home. The representatives of the gas company entered the cellars of the houses on the southerly side of Dalton Street and located the gas service entrances. According to their testimony, there was apparently doubt in their minds as to whether the Millett and Kennison houses were served by one entrance pipe or two, but they informed the defendant's employees that there was one gas service pipe into the Millett house, which they located, and that there might possibly be another pipe into the Kennison house.

The defendant employed one Donald Gurney to furnish a backhoe shovel with an operator. Mr. Gurney is in the sand, gravel and excavating business. Issue is raised as to whether Gurney's shovel operator acted in the role of inde-

pendent contractor or became the agent and employee of the defendant. In any event, the defendant's own employees located the gas pipe leading to the Millett house and carefully dug around it by use of hand shovels. Thereafter the shovel operator continued machine excavating along the line of the water main, moving in a westerly direction in front of the Kennison house. At this point his shovel struck an obstruction in the ground. He immediately ceased excavation and reported the fact to defendant's foreman. One of the defendant's employees then dug around the object with a hand shovel and found it to be a pipe running across the excavated trench and about thirty inches below the surface of the street. Defendant's foreman then entered the trench, examined the pipe and, observing neither the smell of gas nor the presence of water, assumed that it was an abandoned pipe. The water main was eventually laid about two feet below the pipe which had been struck and after about six hours the trench was filled. The gas company was not notified by anyone that any pipe had been struck and had no knowledge thereof.

On June 27, 1953, the plaintiff's daughter entered the Hersum home early in the forenoon. About ten minutes later there occurred an extremely violent explosion in the Hersum house which was of such proportions and so damaging in its effect that the dwelling was subsequently razed to the ground. The neighbor, Mr. Millett, immediately ran to the scene and pulled Helen Hersum from the cellar through a large gap in the wall. She was conscious, although her hair and clothing were in flames. The referees permitted Mr. Millett to testify over objection that he took off his coat and smothered the flames and asked her what happened.

"Q. What was her answer?
A. Her answer was 'I pulled the switch down cellar to turn on the hot water heater and the next thing I knew I was all aflame and found you coming toward me.'

Q. At this point, Mr. Millett, were her clothes still aflame?

A. Yes, and her hair."

The girl was immediately taken to the hospital where she died within a few days as a result of her burns and injuries.

The rest of the Hersum family had been away for about two weeks prior to the date of the accident. The cellar windows were covered with both regular and storm sash. The house was heated by an oil burner located in the cellar which also furnished hot water. Before leaving home, Mr. Hersum had showed his daughter how to control the oil burner switch and had then left it set for manual control in an "Off" position. Helen herself had been away visiting during most of the two week period, but had been in and out of the house on both of the two days before the accident.

The State Director of Fire Prevention was notified and arrived about two hours after the explosion, when he examined the building. He observed that the oil burner switch was in the "On" position. He removed the oil burner, the switch, and the wiring, and had them examined and tested by the mechanical engineering department of the University of Maine, where they were found to be in good operating condition. In the afternoon of the same day an investigation was begun, which was continued and completed two days later, by people with special competence in testing for the presence of escaping gas. In this investigation an apparatus known as an "explosion meter" was used for the purpose of detecting the presence of gas either in limited or explosive quantity. There was a gas service entering the Hersum house, but this had been completely shut off for a considerable period. All tests for leaking gas through or around the gas service were negative. In another part of the cellar, however, there was a hole or opening in the foundation wall on the level of the cellar floor where the water service pipe entered the house. Tests within this opening

disclosed the presence of gas in explosive quantity. A test made under ground outside the foundation wall and opposite the opening likewise disclosed the presence of gas in explosive quantity. A series of underground tests disclosed the presence of gas under ground in explosive quantity in a line which, if projected, would run from the opening in the Hersum cellar toward the street along the approximate line of the water service pipe. The gas main runs along Dalton Street on its northerly side. Further tests disclosed the presence of gas in explosive quantity in the area of this gas main at a point about opposite the Kennison house. By careful hand digging at this point the gas main was exposed and it was found that at this location the gas main was entered by another pipe at right angles by means of a "T" joint. Gas was leaking at this joint and there was present a crack or break in the thread of the feeder pipe which appeared to be fresh. The section of broken pipe is an exhibit. A new excavation was made over the water main in front of the Kennison house and a piece of pipe lying at right angles to the street was removed and is an exhibit. This piece of pipe, although not broken, discloses a substantially bent portion on which appears a shiny area such as might occur if there were fairly recent abrasions. Witnesses who observed the location of the broken joint with reference to the location of the bent pipe and the direction in which both pipes pointed as they lay in the ground testified that each piece was an extension of the other or, in substance and effect, that both pieces were portions of one pipe which was laid across the street to connect with the gas main.

The gas which was being supplied was propane gas. This gas is odorless. When mixed with proper proportions of air, it is highly explosive. With reference to the proportions of gas and air required to render the mixture explosive there are both low limits and high limits. It is therefore manifestly highly dangerous and hazardous and must be handled

and treated with great care and caution. To minimize the danger resulting from the odorless quality of the gas in its pure state and in order to supply a warning of its presence, it is common practice for commercial suppliers to mix with it what is known as ethyl mercaptan, which has an odor which is likened to that of rotten cabbage. This odorant is added in the proportion of one pound to nine or ten thousand gallons of propane gas. Propane is classed chemically as an inert substance and is quite unreactive. Ethyl mercaptan is of an acidic nature and more reactive. Ethyl mercaptan would be adsorbed by other substances with which it might come in contact far more quickly than would propane. The effect of such adsorption of ethyl mercaptan out of its combination with propane would be to diminish the warning odor. Such adsorption might occur if the combined propane and ethyl mercaptan were passing through the soil. Friends of Helen Hersum who were present with her in the cellar of her home on each of the two days immediately preceding the accident testified that there was no odor in the cellar. Neither was there any odor in the cellar when the investigation was being conducted nor even in the area in proximity to the opening in the foundation wall where gas was present in explosive quantity. The odor, however, was very noticeable at the point of the leak in the main. Moreover, a sample of sandy soil taken from the excavation at the site of the leak retained a strong odor of ethyl mercaptan indicating adsorption by the soil at that point.

The referees found for the plaintiff without making specific findings of fact. In so deciding, it is obvious that they deducted from this evidence that the blow given by the backhoe shovel to the gas pipe at the point where it was bent was of sufficient force to damage and break that pipe at the point on the opposite side of the street where it joined the gas main; that gas leaking in substantial quantity from that break found its way under ground and seeped in an easterly

direction until it found a point of escape in the area of the Hersum water service and thence through the opening into the cellar; that while seeping through the soil sufficient quantities of ethyl mercaptan were adsorbed so that the gas lost much or all of its odor; and that the gas accumulated in the cellar until in mixture with the air it had become highly explosive, at which time it was ignited by the act of Helen Hersum in throwing the oil burner switch. The defendant contends that such a theory rests upon nothing more than surmise and conjecture. We have recently had occasion to call attention to the basic differences between surmise and conjecture on the one hand and reasonable inferences upon the other. Referees, like juries, may not base their conclusions on guess or speculation, but they are entitled to draw reasonable inferences from the evidence, and findings will not be upset if the evidence is such as to justify a reasonable belief of the probability of the existence of the material facts. *Thompson* v. *Frankus,* 151 Me. 54; *White* v. *Herbst,* 128 Conn. 659, 25 A. (2nd) 68. Where there are several possible theories to explain the happening of an event, the evidence must be such as to have selective application as to the one adopted by the fact finder. *Jordan* v. *Portland Coach Co.,* 150 Me. 149; *Suburban Electric Co.* v. *Nugent,* 58 N. J. L. 658. In the absence of direct evidence of an element of causation, a reasonable inference may be drawn under some circumstances from what subsequently occurred. *Hatch* v. *Globe Laundry Co.,* 132 Me. 379. Reasonable inferences may be drawn only when they logically flow from the testimony and from physical facts duly proven to have existed. *Cooper & Co.* v. *Can Co.,* 130 Me. 76. The fact finder must ask himself whether one of several possible theories is more rational, logical and probable than the others. If, when examined in the light of the known facts, two or more theories remain equally probable and equally consistent with the evidence, the selection of one to the exclusion of others would rest upon mere surmise and con-

jecture. *Southern Grocery Stores* v. *Greer,* 23 S. E. (2nd) (Ga.) 484; *Houston* v. *Repub. Athletic Association et al.,* 343 Pa. 218, 22 A. (2nd) 715; *Ingersoll* v. *Liberty Bank of Buffalo,* 278 New York 1, 14 N. E. (2nd) 828; *Alling* v. *Northwestern Bell Tel. Co. et al.,* 194 N. W. (Minn.) 313. In making rational and logical deduction from the known facts, both judges and referees may use their own common sense and need not pretend that they do not know that which everyone else knows and which they themselves know outside of court. *Melanson* v. *Reed,* 146 Me. 16; *Lyle* v. *Boston & Aroostook R. R.,* 150 Me. 327.

Applying the foregoing rules to this evidence, we think the referees based their conclusions upon reasonable inferences rather than upon surmise and conjecture. The very nature of the explosion, its violence and destructive force, permitted an inference that gas was a likely cause of this disaster. There was evidence that there were no other highly explosive substances on the premises. Some ammunition and a can of cleaning fluid were found intact. The furnace apparatus was in good condition and there was undisputed evidence that the fuel oil could not and did not cause the explosion. If gas was the explosive agent, how did it enter the cellar? The referees could quite properly find that the tests were efficiently conducted. Those tests eliminated the theory that gas might have entered through or around the gas service entrance. The referees were therefore justified in concluding that it entered through the apertures in the area of the water service where it was, in fact, found in explosive quantity. It may be borne in mind that when these tests were begun there was no knowledge of a gas leak or a broken joint at the main. It is significant that the tests themselves led the investigators along a course to a point where, upon excavation, the gas leak was found. "But it is not necessary that plaintiff should, after establishing that there was a leak in appellant's main in close proximity to the

building with a perfect conduit for the escaping gas to within twelve feet of the building, then follow the escaping gas inch by inch into the basement of the building." *Koch* v. *So. Cities Distributing Co.*, 138 So. (La.) 178, 181. The defendant was unable to suggest any other plausible theory, either as to the nature of the explosive agent or the source of escaping gas. The referees could reasonably infer that there was a direct connection between the striking and bending of the gas service pipe on the southerly side of Dalton Street and the break at the joint in the north side. The defendant complains that the street was not excavated so as to ascertain by direct evidence that the breaking and the bending in fact involved but one single pipe. The plaintiff had no franchise to excavate the street. The defendant had such a franchise and was thereby in better position to make the necessary test if it deemed that the same would be helpful. Be that as it may, the referees had before them for examination portions of the pipe which could be compared as to size, color, apparent deterioration and the like, and they had evidence as to the location of the extremities, their apparent course and direction as they lay in the ground, and their depth below the surface of the street. We do not believe that anyone could seriously doubt that but one pipe was involved and the referees were justified in so finding. They could further properly find that a blow sufficient to produce the bend in a piece of pipe as they observed it was sufficient to cause damage at the point where the pipe entered the main and, in fact, to cause the type of damage which they observed upon examination of the exhibit.

The defendant contends, however, that, even granting all of the foregoing, no negligence chargeable to it or its employees was shown and a resulting explosion in the Hersum house was too remote a consequence as to be legally foreseeable. It is not necessary that the exact injury which results from negligence be foreseeable if, in fact, injury in some

form should have been anticipated as a probable consequence of the negligence and, viewing the occurrence in retrospect, the consequences appear to flow in unbroken sequence from the negligence. *Hatch* v. *Globe Laundry Co., supra; Thompson* v. *Frankus, supra; Barbeau* v. *Buzzards Bay Gas Co.,* 308 Mass. 245, 31 N. E. (2nd) 522. As was stated in *Ill. C. R. Co.* v. *Siler,* 229 Ill. 390, 394, 82 N. E. 362, "If the consequences follow in unbroken sequence from the wrong to the injury without an intervening efficient cause, it is sufficient if, at the time of the negligence the wrongdoer might, by the exercise of ordinary care, have foreseen that some injury might result from his negligence." *McClure* v. *Hoopeston Gas & E. Co.,* 303 Ill. 89, 135 N. E. 43, 25 A. L. R. 250, 259 annotated. When this defendant began excavation of the street it knew that gas pipes were concealed there in various places. It was bound to know that gas is an extraordinarily dangerous element and must be treated with great care and caution. The defendant's awareness of its duty in this respect is shown by the fact that it called upon representatives of the gas company to locate hidden lines and that when it reached an identified location it caused the digging to be done by hand rather than with a power shovel. The defendant was bound to proceed in the exercise of reasonable care and that care would necessarily be commensurate with the danger. The defendant was under a duty to anticipate that if it struck and injured a pipe carrying gas, causing the gas to escape, that gas would gather in some location and in all probability would ultimately injure some person or property in some manner. As was stated in *Ehret* v. *Village of Scarsdale et al.,* 269 New York 198, 199 N. E. 56, 59, "In this case it is plain that by the exercise of reasonable vigilance, the defendant (not a gas company but the holder of a permit to excavate the street and construct a drain) might have anticipated that gas might leak from a break in the injured gas main (damaged by defendant) at the point where it was incased in the pipe drain, and that

the escaping gas might find its way into a public sewer or a farm drain in the street and from there into houses along the street, and endanger life or property in such houses. Ordinary foresight would suffice for that, but no foresight, however extraordinary, would have enabled the defendant to determine when, where, or how such injury would occur. The orbit of danger was undefined, both in time and space. In fact, no damage resulted from the negligent act for almost a year, and then the damage occurred almost simultaneously in two separate houses at considerable distance from each other and from the point of the leak. *Nonetheless, the damage was the result of a danger which could have been anticipated by the exercise of reasonable foresight."* (Emphasis supplied)

After the gas service pipe had been struck and severely bent by the power shovel the defendant was immediately notified of that fact. The defendant had been warned of the possible existence of another gas pipe in the area. The examination then made by the defendant disclosed to it the size and nature of the pipe, its location and direction as it lay beneath the ground and, coupled with the warning already received, should have made it apparent to the defendant, in the exercise of reasonable care, that in all probability this was a gas service pipe. The defendant then had a plain duty to notify the gas company so that further examination might be made to ascertain whether other serious and concealed damage had been caused. The defendant elected to rely wholly upon its own cursory examination of the bent pipe and proceeded to act upon the erroneous assumption that this was an abandoned pipe. An employee of the defendant testified that if he had been aware that this was a gas service pipe, he would have notified the gas company. Under somewhat similar circumstances the California court recognized that it is the duty of one who, while excavating in a street, strikes and bends a gas service pipe, to notify the gas company of the accident. Failure to give such noti-

fication is negligence. *Rauch et al.* v. *So. Cal. Gas Co. et al.*, 273 P. (Cal.) 1111.

We think the referees upon this evidence could further find negligence on the part of the defendant in permitting the gas service pipe to be forcibly struck and bent by the power shovel. The defendant was well aware of the caution which must be exercised in locating and digging out a gas service pipe which is carrying gas. It did not permit the power shovel to be used at the location of the first pipe, but conducted the whole operation with hand digging. It knew of the possibility of the second pipe and it knew the location of the gas service entrance in the cellar of the Kennison house. Under the circumstances which were here present, we think it makes no difference whether the operator of the power shovel was a servant and agent of the defendant or an independent contractor. The defendant in any event was exercising control as to when and where the shovel should be used and how deep an excavation should be made with it. The apparent hazard to be anticipated from negligence was so great that the defendant could not avoid responsibility. Such a rule has been adopted where the danger to others is great. " 'A duty is imposed upon the employer in doing work necessarily involving danger to others, unless great care is used, to make such provision against negligence as may be commensurate with the obvious danger. It is this duty which cannot be delegated to another so as to avoid liability for its neglect.' " *Grinnell* v. *Carbide & Carbon Chemicals Corp.*, 282 Mich. 509, 276 N. W. 535, 542; *Covington, etc., Bridge Co.* v. *Steinbrock & Patrick*, 61 Ohio State 215, 55 N. E. 618; *Nugent* v. *Boston Consol. Gas Co.*, 130 N. E. (Mass.) 488.

In the action seeking to recover for the injury and death of Helen D. Hersum, her due care is presumed by effect of the statute. R. S., 1954, Chap. 113, Sec. 50. The burden of proving her contributory negligence falls upon the defend-

ant. The defendant in discharge of its burden of proof has not adduced even a scintilla of evidence pointing to her contributory negligence. The uncontradicted testimony shows that the gas connections to the Hersum house had been shut off so that there was no reason for any member of the family to anticipate the presence of gas in the house; that as recently as the day before the fatal explosion there had been no odor of gas in the cellar; that immediately after the explosion there was no odor of gas even in the vicinity of the aperture where gas was discovered in explosive quantity. There is no showing that Helen Hersum knew, or ought reasonably to have known, what quantity of propane gas would have to be present in a large cellar to form a dangerously explosive mixture. Nor is there any showing that she knew, or ought to have known, that such a quantity of propane gas was present. That such a result as to contributory negligence is amply supported by authority is well demonstrated by cases assembled in annotations in 25 A. L. R. 278 and 26 A. L. R. (2nd) 189. The contributory negligence of Harold D. Hersum is not even suggested.

An examination of the authorities suggests that it was not encumbent upon the plaintiff here to prove the method of ignition of the gas. The defendant, having negligently introduced an explosive quantity of gas into plaintiff's cellar, could reasonably anticipate that the gas would be ignited by some means, whether by a spark or a flame. However, we find no error in the ruling of the referees in admitting the statement of Helen Hersum explaining the method of ignition by her throwing the oil burner switch. Under the circumstances which then existed, the statement was clearly a part of the *res gestae*. The case of *Barnes* v. *Rumford*, 96 Me. 315, is clearly distinguishable. In that case the occurrence had ended and the speaker was not then performing any act. Here, however, the event was not terminated but was still continuing. The explosion itself was not the whole

event. It was followed inevitably by fire and the speaker, herself on fire, was in the process of being rescued from the devastated building. This was no mere narration of a past event. Rather was it a spontaneous explanation uttered in the course of a continuing action. In *State* v. *Maddocks,* 92 Me. 348 at 353, the general rule was stated as follows: "It is said in *Lander* v. *People,* 104 Ill. 248, that, 'the true test of the admissibility of such testimony is, that the act, declaration or exclamation must be so intimately interwoven with the principal fact or event which it characterizes, as to be regarded a part of the transaction itself, and also to clearly negative any premeditation or purpose to manufacture testimony.'" 20 Am. Jur. 553, Sec. 662, states in part, "Stated differently, the term *'res gestae'* comprehends a situation which presents a startling or unusual occurrence sufficient to produce a spontaneous and instinctive reaction, during which interval certain statements are made under such circumstances as to show lack of forethought or deliberate design in the formulation of their content. Statements which conform to these requirements and which in some way elucidate, qualify, or characterize the act in question are admissible in evidence as a distinct and separate exception to the hearsay rule." The precise form of the statement does not govern its admissibility. It may be in narrative form and in answer to a question if it meets all the requirements of admissibility as part of the *res gestae.* 20 Am. Jur. 559, Sec. 668; *Murray* v. *Boston & M. R. R. Co.,* 72 N. H. 32, 54 A. 289. It is inconceivable that this young girl could, while in such dire stress as she then was, cleverly fabricate a self-serving statement.

In conclusion, no error on the part of the referees appearing, and awards to the plaintiff being adequately supported by the evidence and reasonable inferences to be drawn therefrom, the entry will be,

*Exceptions overruled.*