**In re ALL MAINE ASBESTOS LITIGATION. (BIW CASES)**

United States District Court,
D. Maine.

Dec. 29, 1986.

Peter J. Rubin, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for Wellington defendants.

Mark G. Furey, Portland, Me., for Raymark Industries, Inc.

Joseph Cox, Jr., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for third party defendant U.S.A.

MEMORANDUM OF OPINION AND OR-DER ON THE GOVERNMENT'S MO-TION TO RECONSIDER AND FOR ENTRY OF FINAL JUDGMENT

GIGNOUX, Senior District Judge.

Third-party defendant United States of America has moved for reconsideration of this Court's Memorandum of Opinion and Order dated February 23, 1984, denying the United States' motion to dismiss or for summary judgment on Count VI of Model Third-Party Complaint A. Defendant as-

bestos manufacturers have filed this complaint in all asbestos-related cases brought in this Court by present and former employees, and the representatives of deceased employees, of Bath Iron Works (BIW), a private shipyard located in Bath, Maine. *See In re All Maine Asbestos Litigation*, 581 F.Supp. 963 (D.Me.1984). In support of its motion, the United States relies on the recent decision of the United States Court of Appeals for the First Circuit in *Drake v. Raymark Industries, Inc.*, 772 F.2d 1007 (1st Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986). *See also In re All Maine Asbestos Litigation (PNS Cases)*, 772 F.2d 1023 (1st Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986). As Count VI is the only remaining claim for relief in Model Third-Party Complaint A, if, upon reconsideration, the Court dismisses Count VI, the United States seeks entry of final judgment dismissing the third-party complaint in each action.

The factual and legal circumstances surrounding the filing of Model Third-Party Complaint A are fully set forth in this Court's previous decision, and thus need not be repeated here. It is sufficient to say that plaintiffs have sued various manufacturers and suppliers of asbestos-containing products seeking to recover damages for injuries allegedly sustained as a result of exposure to asbestos dust during the course of their (or their decedents') employment at BIW while performing construction or repair work on U.S. naval vessels. The complaints assert causes of action based on negligence, strict liability, and breach of express and implied warranties. Jurisdiction is predicated upon diversity of citizenship. *See* 28 U.S.C. § 1332(a) (1982); *Austin v. Unarco Industries, Inc.*, 705 F.2d 1, 3 (1st Cir.), *cert. dismissed*, 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983). Certain of these defendants have filed Model Third-Party Complaint A in each of the actions seeking contribution and/or noncontractual indemnification against the United States.

Model Third-Party Complaint A asserted nine claims for relief against the United States. In its *All Maine* decision, this Court granted the United States' motion to dismiss or for summary judgment with respect to Counts I–V and Counts VII–IX. *See* 581 F.Supp. at 969–74, 977–80. With respect to Count VI, insofar as that count sought contribution and/or indemnification from the United States in its capacity as vessel owner, the Court found that there were disputed issues of material fact which rendered summary judgment inappropriate. *See id.* at 975–77. This finding was based on the Court's conclusions (1) that plaintiffs in these actions were protected by the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901–950 (1982), and had a right of action under section 5(b) of that Act, 33 U.S.C. § 905(b), to recover damages from the United States in its capacity as a vessel owner for injury caused by its negligence; and (2) a defendant can bring a third-party action against the United States as vessel owner for indemnification and contribution based upon the United States' breach of duties owed to the plaintiffs. *See id.* In *Drake*, the First Circuit dismissed the defendant asbestos manufacturer's vessel owner action against BIW, holding that section 5(b) of the LHWCA is limited to maritime torts and that admiralty law does not apply to asbestos injuries sustained by shipyard workers. *See* 772 F.2d at 1011–19. The United States here contends that *Drake* mandates dismissal of the analogous vessel owner count (Count VI) asserted against the United States in Model Third-Party Complaint A. Defendants argue that *Drake* is distinguishable. Alternatively, defendants assert liability of the United States for violation of duties of care owed plaintiffs under Maine law.[1] The United States responds

---

1. Count VI contains two distinct theories of recovery. First, defendants seek contribution or indemnity from the United States as the owner of the naval vessels on which the plaintiffs worked; the source of the asserted duty is section 5(b) of the LHWCA. Second, defendants seek contribution or indemnity from the United States because of alleged negligence of the government on various "land-based" theories; the source of these alleged duties is Maine

that any such claim would be barred by the discretionary function exception to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a) (1982).

The parties have comprehensively briefed and argued the issues thus presented, and pursuant to the Court's request they have submitted voluminous supplementary materials addressing the applicability of the discretionary function exception to the FTCA. Counsel have agreed that these materials constitute the relevant record.

The Court will first consider defendants' contention that, despite *Drake*, the United States may be liable for contribution or indemnity as the owner of naval vessels at BIW under section 5(b) of the LHWCA. The Court will then address defendants' argument that the United States may be liable for contribution or indemnity under various provisions of Maine tort law.

### I.

#### LHWCA § 905(b) Vessel Owner Theory of Liability

█ In dismissing the defendant asbestos manufacturer's vessel owner action against BIW in *Drake*, the First Circuit concluded that only maritime torts are cognizable under section 5(b) of the LHWCA. *See* 772 F.2d at 1013–14. Because the defendant manufacturer's third-party action

against BIW was predicated solely on BIW's alleged breach of duty as vessel owner *pro hac vice* to employee Drake, the Court stated that "the proper question [was] whether plaintiff Drake could have maintained a § 905(b) action against BIW for his injuries." *Id.* at 1014. Accordingly, the Court looked to whether Drake's injury "would be cognizable in admiralty, or have admiralty law applied to it." *Id.* Applying the two-prong test of *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), as well as its previous decision in *Austin v. Unarco Industries, Inc.*, 705 F.2d at 8–14, and the decisions of five other circuit courts, the First Circuit held that while the *situs* test was satisfied because the alleged wrong occurred on navigable waters, the *nexus* test was not, because the wrong did not bear a significant relationship to traditional maritime activity. *See* 772 F.2d at 1014–19. Noting that the "universal conclusion is that admiralty law does not apply to these torts," *id.* at 1016, the First Circuit therefore concluded that "neither plaintiff nor defendants can bring a § 905(b) negligence action against BIW *qua* shipowner *pro hac vice.*" *Id.*[2] In *All Maine*, decided shortly after *Drake*, the First Circuit reaffirmed its decision in *Drake*, and held that the defendant manufacturers' section 905(b) third-party vessel owner claim against the United States in Model Third-Party Com-

---

tort law. In *All Maine,* this Court did not reach defendants' land-based theories because the Court found that defendants had stated a viable section 905(b) vessel owner claim against the government and the liability of a vessel owner under section 905(b) was "probably broader than that ... under state law." *See* 581 F.Supp. at 975 n. 12.

**2.** Although not necessary to its decision, the First Circuit in *Drake* expressed doubt "whether a contribution action premised solely upon § 905(b) can proceed without having as its predicate a § 905(b) primary action properly brought by one of the parties authorized by the statute," 772 F.2d at 1011. The court stated:

Especially in a situation such as this, where the primary action is based on distinctly non-maritime rights and duties—duties owed by any manufacturer of a product later determined to be defective and which bear no significant relationship to maritime com-

merce—it seems that defendants cannot use § 905(b) as a source of a right to contribution from a shipowner or owner *pro hac vice.* Our study of the decisional law failed to uncover any cases where § 905(b) was allowed to be asserted as the basis for liability in a third-party action where it was not sued upon in a primary action. We note, however, that the parties did not raise or brief this question. We therefore shall bracket this question and assume *arguendo* that defendants are not barred from bringing a contribution action based on the plaintiff's omission of a § 905(b) claim in her action.

*Id.* at 1011–12. In *Drake,* as in the present cases, the plaintiff did not bring a section 905(b) action against BIW. This Court also will assume *arguendo* that defendants are not barred from bringing their third-party action by plaintiffs' failure to assert a section 905(b) claim.

plaint B, involving asbestos claims arising out of work at the Portsmouth Naval Shipyard, must be dismissed for failure to state a claim on which relief can be granted, because section 905(b) "countenances only maritime torts." 772 F.2d at 1029.

In the present cases, defendants acknowledge the holding of *Drake* and *All Maine* that liability under section 5(b) of the LHWCA is limited to maritime torts. They contend that the vessel owner claims against the United States at Bath differ from the parallel claims against BIW at issue in *Drake* and the claims against the United States at PNS considered in *All Maine.* They suggest that the former claims are maritime. The Court must disagree.

In the instant cases, there is no dispute that plaintiffs' injuries occurred, at least in part, on United States naval vessels in the Kennebec River, a navigable waterway, and thus satisfied the *situs* requirement of *Executive Jet. See Drake,* 772 F.2d at 1015. But plaintiffs' injuries do not satisfy *Executive Jet*'s *nexus* requirement. On this issue, the vessel owner claims asserted in these cases are virtually indistinguishable from the claims found not to be maritime in *Drake* and *All Maine.*

In *Drake* and *All Maine,* the First Circuit adopted the four-part *nexus* test established in *Harville v. Johns-Manville Products Corp.,* 731 F.2d 775 (11th Cir.1984). Under the *Harville* approach, in determining whether an injury bears a significant relationship to maritime activities, the criteria to be considered are the functions and roles of the parties, the type of vehicles and instrumentalities involved, the causation and type of injury, and traditional concepts of the role of admiralty law. *See id.* at 783–84. The injuries here are in all pertinent respects the same as the injuries in *Drake* and *All Maine* that the First Circuit found to lack a sufficient relationship to traditional maritime activity to support the application of maritime law. *See Drake,* 772 F.2d at 1016; *All Maine,* 772 F.2d at 1029–30, 1031–32.

Defendants seek to distinguish *Drake* and *All Maine* on the ground that in those cases the vessel owners—BIW and the United States—also owned the shipyards where the injuries occurred, whereas here the United States is a vessel owner but does not own the shipyard. Defendants assert that this difference is critical to the application of the fourth *Harville* factor, "traditional concepts of the role of admiralty law." Where a vessel owner is also a shipyard owner, the argument continues, that vessel owner will likely choose to have its vessel repaired in its own shipyard; that choice is unlikely to be influenced by the consideration that different States in which different shipyards are located might impose less (or more) stringent duties on vessel owners who put in to those shipyards. Vessel owners who do not also own shipyards, on the other hand, will be influenced in their choice of shipyards by these variations in local tort law, and defendants forecast that this law-shopping will inhibit maritime commerce. Because the protection of such commerce is one of admiralty law's traditional roles, defendants conclude, the tort law applicable to vessels in port for repairs must be made uniform across all ports, and this can best be achieved by holding injuries on board such vessels to be "maritime torts" cognizable under LHWCA section 905(b).

This argument is clever but insubstantial. Defendants offer no examples of the vagaries of local law that they claim would influence a vessel owner's choice of a shipyard for repairs. Nor do they offer any evidence that vessel owners are in fact influenced by such considerations. Traditional concepts of the role of admiralty law are no more implicated here than in *Drake* and *All Maine;* in fact, the First Circuit in *All Maine* rejected the very argument defendants advance here. *See* 772 F.2d at 1031–32. Finally, as the First Circuit observed in *All Maine:*

> "[T]he risk encountered by plaintiff's decedent is not a risk arising from the loading or operation of a vessel, against which those on the vessel are typically protected by the vessel owner. It is,

rather, *the same risk as that encountered by a number of workers on a shortside [sic] construction project.*

"Whatever anomalous results may follow from distinguishing between harbor workers according to the maritime nature of the hazards they encounter are at least offset, if not outweighed, by the anomalous results of treating construction workers injured by asbestos poisoning differently depending on whether they were installing asbestos in a ship or in an office building overlooking the harbor. *The state has an interest in providing uniform treatment to these two like workers.*"

772 F.2d at 1030, quoting from *Austin v. Unarco,* 705 F.2d at 13 (emphasis added in *All Maine* ).

That portion of Count VI of Model Third-Party Complaint A which asserts a contribution and indemnification claim against the United States based upon section 5(b) of the LHWCA must be dismissed for failure to state a claim upon which relief can be granted.

## II.

### Land-Based Theories of Liability

Count VI asserts that the United States is liable for contribution and indemnity because of alleged negligence of the government on three separate "land-based" theories, the source of these alleged duties being various provisions of Maine tort law. The first theory characterizes the naval vessels on which plaintiffs worked as "premises" and alleges that the United States as owner of these premises breached its duty to warn BIW employees of the existence of asbestos hazards hidden on these premises. *See, e.g., Poulin v. Colby College,* 402 A.2d 846, 851 (Me.1979) (holding that landowner owes duty of reasonable care in all circumstances to all persons lawfully on the land). The second theory asserts that the United States, as the employer of an independent contractor (BIW) performing peculiarly hazardous work (involving asbestos), breached its duty to exercise due care to ensure that the contractor took appropriate precautions to prevent harm to its employees from this peculiar hazard. *See Hersum v. Kennebec Water District,* 151 Me. 256, 268, 117 A.2d 334 (1955); *Lindsay v. McCaslin,* 123 Me. 197, 200, 122 A. 412 (1923); *Restatement (Second) of Torts* § 413 (1964).[3] The third theory asserts that the United States breached its duty of care in exercising the control over work safety at BIW that the United States allegedly retained; more specifically, defendants assert that the United States had a duty to exercise its authority to stop work when it learned that its contractor BIW was exposing BIW employees to unreasonable risks of asbestos-related injury. *See Restatement (Second) of Torts* § 414 (1964); *cf. Thorne v. United States,* 479 F.2d 804 (applying California law on employer's duty to stop work; holding United States liable under FTCA).

While not conceding that these land-based theories set forth valid claims under Maine law, the United States asserts that in any event they are barred by the discretionary function exception to the FTCA and therefore must be dismissed for lack of subject matter jurisdiction. On this record, the Court cannot agree.

The FTCA subjects the United States to liability

for money damages ... for ... personal injury or death caused by the negligent or wrongful act or omission of any em-

---

**3.** Although defendants cite in their memoranda *Restatement (Second) of Torts* § 416 (1964) (stating a rule of strict liability for the employer of an independent contractor performing peculiarly hazardous work, where the contractor fails to exercise reasonable care to take appropriate precautions), the memoranda make clear that they assert liability based on the United States' own negligence in failing to exercise due care to ensure that its independent contractor

BIW took appropriate precautions. *See id.* § 413; *Thorne v. United States,* 479 F.2d 804 (9th Cir.1973); *cf. McMichael v. United States,* 751 F.2d 303, 310 (8th Cir.1985). The United States, of course, may not be held liable under the FTCA on a theory of strict or absolute liability, *see Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972), or for the acts or omissions of independent contractors. *See* 28 U.S.C. §§ 1346(b), 2671 (1982).

ployee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b) (1982). The Act further provides that the United States shall be liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (1982).

The discretionary function exception to the government's liability under the FTCA is set forth at 28 U.S.C. § 2680(a), which provides in relevant part that the provisions of the FTCA shall not apply to

(a) [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

In the seminal case of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Supreme Court delineated the broad contours of the discretionary function exception. In that case, the Supreme Court stated that

the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

346 U.S. at 35–36, 73 S.Ct. at 968 (footnotes omitted).

In the recent case of *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), the Supreme Court reaffirmed its earlier interpretation of § 2680(a), although it acknowledged that its interpretation of the discretionary function exception "admittedly has not followed a straight line." *Id.* at 811–12, 104 S.Ct. at 2764. The Court identified two basic principles for interpreting the discretionary function exception that it found implicit in *Dalehite:*

First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. As the Court pointed out in *Dalehite*, the exception covers "[n]ot only agencies of government ... but all employees exercising discretion." 346 U.S., at 33 [73 S.Ct. at 966]. Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.

Second, whatever else the discretionary function exception may include, *it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals....* Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.

*Id.* at 813–14, 104 S.Ct. at 2765 (emphasis supplied) (footnote omitted).

In *Shuman v. United States*, 765 F.2d 283 (1st Cir.1985), the First Circuit applied the principles established by the Supreme Court in *Dalehite* and *Varig Airlines* to hold that the discretionary function exception barred liability of the United States for failure to warn the employees of a private shipyard of the dangers of working with asbestos. In that case, Shuman was employed in 1942, and again from 1951–53, at the Fore River Shipyard, a private shipyard in Quincy, Massachusetts. He died as a result of mesothelioma resulting from his exposure to asbestos dust during his employment at the shipyard. His widow sued

the United States under the FTCA, asserting that the United States breached a duty imposed by section 35(e) of the Walsh-Healey Act, 41 U.S.C. § 35(e) (1982), to warn the deceased of the dangers of working with asbestos. After a bench trial, the district court in an unpublished opinion held the United States liable, finding the source of duty not in the Walsh-Healey Act but instead in section 5(b) of the LHWCA and the status of the United States as owner of the Navy vessels on which the deceased had worked. *See Shuman,* 765 F.2d at 284, 290–91.

The First Circuit reversed, holding that the discretionary function exception to the FTCA barred liability of the United States both under the plaintiff's Walsh-Healey Act theory and the district court's LHWCA section 905(b) theory.[4] As to the plaintiff's theory, the court held that Congress had structured a great deal of administrative discretion into the Walsh-Healey Act. Both the "government's omission of a policy requiring the Federal Department of Labor, or others acting under its authority, to warn the endangered workers themselves of a work hazard" and "the omission of a government directive authorizing the federal government 'to make [the workplace] safe'" were held to be discretionary acts protected by the discretionary function exception to the FTCA. *Id.* at 290 (bracketed material in original). With respect to the district court's section 905(b) theory, the First Circuit held that "[t]he official policy at this time [when Shuman first worked at the shipyard in 1942] was not to regulate 'the conduct of private individuals' ... regarding the use of asbestos or other hazardous substances." *Id.* at 292 (quoting *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2765). Continuing, the First Circuit stated:

> [T]he omission of regulations and an enforcement apparatus designed to minimize occupational hazards in the shipyards was a matter of administrative, and perhaps even legislative, discretion

protected by the discretionary function exception. Similarly, the Navy decision to provide technical inspectors on site to test for quality control and adherence to government plans and specifications, and not to provide inspectors with authority for promoting or ensuring the safety and health of the government contractor's employees, was a matter of protected discretion.

*Id.* (footnote omitted).

■ *Dalehite, Varig Airlines,* and *Shuman* teach that government acts and omissions are discretionary when the government employee involved either makes or carries out in a prescribed manner a decision grounded in social, economic, or political policy. These cases further indicate that government acts and omissions will normally be characterized as discretionary when the government is acting in its role as a regulator of the conduct of private individuals, and that a government decision about whether to impose safety requirements on private individuals, whether through regulatory programs or contractual provisions, will usually be characterized as discretionary. These cases also establish that government decisions about whether to conduct inspections to monitor compliance with these requirements will usually be characterized as discretionary. *See also Feyers v. United States,* 749 F.2d 1222, 1227 (6th Cir.1984), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985) (holding that government decision to conduct only spot checks of contractor's safety programs was discretionary).

Although the Supreme Court and the First Circuit have not addressed the question, post-*Varig Airlines* cases from other circuits appear to make the applicability of the discretionary function exception turn on whether "the regulatory inspection and enforcement activities of an agency require its employees to exercise discretion in performing their duties." *Hylin v. United*

---

4. Both the *Shuman* district court's finding of liability and the First Circuit's reversal of that finding occurred prior to the First Circuit deci-

sions in *Drake* and *All Maine,* which found injuries such as that at issue in *Shuman* not to be cognizable under LHWCA section 905(b).

*States,* 755 F.2d 551, 553 (7th Cir.1985). *Compare Merklin v. United States,* 788 F.2d 172, 173–74 (3d Cir.1986) (holding that Atomic Energy Commission's apparently unbounded discretion in conducting plant inspections barred liability under FTCA); *Hylin,* 755 F.2d at 553 (holding that where mine safety inspector who discovered violation could choose between two types of orders to mine owner and two means of abatement, inspector's acts were within discretionary function exception); and *Cunningham v. United States,* 786 F.2d 1445, 1447 (9th Cir.1986) (holding that "acts of OSHA inspectors in executing agency directives" were within discretionary function exception) *with Collins v. United States,* 783 F.2d 1225, 1230–31 (5th Cir. 1986) (holding that mine inspectors' disobedience of a "flat command" in regulations, requiring them to close a mine in light of measurements they had made, was not discretionary) and *McMichael v. United States,* 751 F.2d 303, 307 (8th Cir.1985) (holding that acts of Army inspectors of private munitions plant were not discretionary where inspectors were to follow a fifty-one step procedures review checklist for safety compliance and were not called upon to make discretionary regulatory judgments). *See also Merklin,* 788 F.2d at 175 (reading *McMichael* as finding government inspectors' acts nondiscretionary where inspectors were obligated to perform "precise and highly technical inspections involving no policy judgment"); *cf. Feyers,* 749 F.2d at 1227 n. 7 ("[T]he discretionary function exception does not apply where mandatory guidelines or regulations are violated" by government employees).

With these principles in mind, the Court now proceeds to consider whether the acts and omissions here complained of may be characterized as discretionary. A review of the statutes, regulations, contracts and practices applicable at BIW during the period of time that plaintiffs in these cases were employed at BIW (from approximately 1940 to approximately 1980) discloses that for the most part the United States made discretionary decisions to place primary responsibility for maintaining a safe workplace on its contractor BIW. Nevertheless, issues of material fact exist as to the discretion enjoyed by Navy personnel in implementing certain directives regarding asbestos precautions and in performing safety inspections. Summary judgment is therefore inappropriate.

The Court will first review the various decisions to impose on BIW, whether through regulatory or contractual means, obligations relating to workplace safety and asbestos hazards. Related to these are decisions granting government personnel varying degrees of authority and responsibility to enforce such obligations. Second, the Court will review decisions relating to the actual or attempted exercise of that authority by government personnel at BIW. Within each of these categories, the Court will discuss the relevant decisions in chronological order and analyze the applicability of the discretionary function exception to those decisions.[5]

### A.

■ Defendants point to five sets of safety directives which they claim charged government personnel at BIW with nondiscretionary duties.

First, throughout the period relevant to this litigation, the Navy decided to invoke in its contracts with BIW the provisions of the Walsh-Healey Act, 41 U.S.C. §§ 35–45 (1982). These provisions bound BIW not to perform the contract "under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of said contract." 41 U.S.C. § 35(e) (1982). Regulations issued thereunder by the Secretary of Labor required contractors to reduce or control harmful atmospheric contaminants such as dusts at their source, to isolate these sources from other work ar-

---

**5.** The Court sees no need to discuss the government's alleged retention of control over matters other than the safety of BIW employees.

eas, and to provide government-approved respirators to workers unavoidably exposed to these contaminants. *See* Wage and Hour and Public Contracts Divisions, U.S. Department of Labor, *Basic Safety and Health Requirements for Establishments Subject to Walsh-Healey Public Contracts Act* 8–9 (1943). Versions of these regulations issued in 1951 and thereafter included specific asbestos exposure standards. But, because in enforcing the Walsh-Healey Act the Secretary of Labor was given "a great deal of administrative discretion," the *Shuman* court concluded that the discretionary function exception barred claims alleging that the United States breached duties under that Act. *See* 765 F.2d at 290. This Court is bound by that determination.

■ Second, from early 1943 to October 1945, the Navy decided to make applicable to BIW certain "Minimum Requirements for Safety and Health in Contract Shipyards," which dealt in part with the hazards of asbestos dust. Officials from the office of the Navy's Supervisor of Shipbuilding (SUPSHIP) were charged with enforcing these requirements. But the First Circuit already has concluded in *Shuman* that the Minimum Requirements program was "basically an advisory and educative program," 765 F.2d at 293, in which "the level of enforcement responsibility vested in SUPSHIP falls below the level necessary to ground any claim of operational negligence by SUPSHIP." *Id.* at 292 n. 7. Under *Shuman*, therefore, claims against the United States based on the imposition of or alleged failure to enforce these Minimum Requirements are barred by the discretionary function exception.

■ Third, after 1958 the Navy decided to invoke in its contracts with BIW the newly-amended health and safety provisions of LHWCA section 41, 33 U.S.C. § 941 (1982). *See Shuman*, 765 F.2d at 287–88 (discussing 1958 amendments to

LHWCA). Under the authority of these amendments, the Secretary of Labor promulgated detailed safety and health regulations for ship repairing, including requirements that employees should be provided with respirators providing defined levels of protection against inhalation of asbestos fibers. *See* 25 *Fed.Reg.* 4027 (Mar. 27, 1964); 32 *Fed.Reg.* 14050 (Oct. 10, 1967). But a reading of LHWCA section 941 discloses that Congress delegated to the Secretary of Labor a degree of enforcement discretion comparable to that enjoyed by the Secretary under the Walsh-Healey Act. Under *Shuman*, therefore, claims against the United States based on the imposition of or alleged failure to enforce safety requirements under the LHWCA are barred by the discretionary function exception.

■ Fourth, the Navy in its 1969 Ship Repair Contracting Manual, which was developed for the guidance of SUPSHIP personnel and not incorporated into contracts with BIW, included the following paragraph:

11–3.1.3 *Safety*

(a) The contractor is responsible for observing safe practices on all work under his cognizance. Clause 24 of the [Master Ship Repair] contract directs the contractor's attention to his responsibility for complying with the Department of Labor Safety and Health Regulations for Ship Repairing. The ship, in turn, is responsible for observing safe practices in all of its actions. For example, ship's ladders and passages should be kept free of material, lines, and debris to allow free and unobstructed passage. Temporary service and welding lines should be triced up. Companionways and compartments should be properly lighted for easy access and safety. Both the ship's force and the contractor are responsible for reporting any unsafe conditions to the senior SUPSHIP surveyor.[6]

---

6. Earlier manuals addressed safety only tangentially. The 1960 Shipbuilding and Boatbuilding Manual for Supervisors of Shipbuilding and Contract and Technical Personnel provided that the SUPSHIPS Inspection Department was to ensure compliance with "contract specifications" but referred specifically to quality control and scheduling rather than safety. The 1965 Shipbuilding and Boat Building Contract Manual made the Personnel Division of the Adminis-

This manual did not charge government personnel with any additional duties to ensure that BIW workers were protected from asbestos. The contractor was still responsible for compliance with Department of Labor regulations, including those addressed specifically to asbestos hazards. The examples given made clear that precautions against asbestos encountered during so-called "rip-outs" of existing equipment, which were performed by BIW workers, would fall into the category of "safe practices on all work under [the contractor's] cognizance" rather than "safe practices in all of [the ship's] actions." Moreover, although the ship's force was to report unsafe conditions to the senior SUPSHIP surveyor, this latter individual was not charged with specific duties to report to the contractor or otherwise to remedy any conditions so reported. Paragraph 11–3.3 of the same manual stated that inspectors from the ship's force should deal not directly with the contractor but only with the SUPSHIP surveyor, who was to "take appropriate action" if he or she "consider[ed] the performance of work on the specific work item unsatisfactory." In addition, Paragraph 12–7(b) provided that "[i]n general, the SUPSHIP surveyor should not be concerned with unsafe practices on the part of the contractor which do not have a direct bearing on the safety of Government personnel or property" because this might "be construed by the contractor as SUPSHIP interference with the normal workings of the shipyard." Whether or not any members of the ship's force fulfilled their duty under Paragraph 11–3.1.3 by reporting unsafe conditions to the SUPSHIP surveyor, therefore, the SUPSHIP surveyor was vested with sufficient discretion to bring within the discretionary function exception his or her actions with respect to any unsafe conditions so reported.[7]

██ Fifth, after 1970 the Navy decided to invoke in its contracts with BIW the requirements of the newly-enacted Occupational Safety and Health Act (OSHA), 29 U.S.C. §§ 651–678 (1982). Under the authority of OSHA, the Secretary of Labor promulgated detailed regulations governing exposure to asbestos dust. *See* 36 *Fed. Reg.* 23207–08 (Dec. 7, 1971); 37 *Fed.Reg.* 11320–22 (June 7, 1972); 39 *Fed.Reg.* 23502 (June 27, 1974); 41 *Fed.Reg.* 11505 (Mar. 19, 1976); *see also* 29 CFR § 1910.1001 (1986) (codifying current OSHA asbestos standard). As with the Walsh-Healey Act and LHWCA standards, however, claims against the United States based on the imposition of or alleged failure to enforce OSHA safety requirements are barred by the discretionary function exception. *See, e.g. Cunningham v. United States,* 786 F.2d at 1447 (holding that the acts of OSHA inspectors in executing agency directives are protected by the discretionary function exception); *Feyers v. United States,* 749 F.2d at 1224 n. 2, 1226–27 (holding that, where government contractor agreed to comply with OSHA standards, discretionary function exception protected United States' decisions to delegate safety

trative Department of the central SUPSHIP office responsible for "[p]roviding contractors with any useful information which may promote industrial health and safety." Defendants do not argue that these provisions represent any departure from previous decisions by the United States as to the extent to which it would involve itself in asbestos precautions at BIW.

7. Defendants press no argument based on provisions included in later SUPSHIP manuals. These include (1) a 1972 Quality Assurance Supplement provision which instructed SUPSHIP to monitor the contractor's safety program and report the use of hazardous or dangerous materials, (2) a 1974 Ship Repair Manual provision instructing SUPSHIP to "request OSHA Department of Labor compliance officers to conduct reviews as necessary," (3) another 1974 provision instructing SUPSHIP immediately to notify the contractor of OSHA violations that endangered government personnel or property, and (4) a 1978 Ship Repair Manual provision amending Paragraph 11–3.1.3(a) to state that although ultimate responsibility for employee safety remained with the contractor, SUPSHIP was "responsible for monitoring the contractor's safety and health program including the investigation of complaints of shipboard occupational safety and health matters brought to its attention." None of these provisions alters the basic decisions described in the text as to the extent to which the United States would involve itself in asbestos precautions at BIW.

responsibility to contractor, to conduct only spot checks of contractor's compliance, and not to institute a safety training program for contractor's employees).

#### B.

■ Defendants point to three items of evidence suggesting that the United States undertook to enforce compliance with asbestos safety standards at BIW.

First, they rely on a "Report on Investigation of Asbestosis from Amosite Pipe Covering at Bath Iron Works," issued in 1944 by the Safety and Industrial Health Program of the joint U.S. Navy/U.S. Maritime Commission War Shipping Administration (hereinafter "1944 Report"). This five-page report included a four-element "Suggested Safety Program" to monitor and protect the health of BIW workers exposed to asbestos. Though the record is unclear, the 1944 Report presumably was issued to SUPSHIP officials at BIW. Defendants acknowledge that the 1944 Report was issued pursuant to the Minimum Requirements program discussed in *Shuman.* They further acknowledge the *Shuman* court's determination that the program was "basically an advisory and educative program," in which the United States was under no duty actually to conduct inspections. Once the United States did conduct such an inspection at BIW, however, defendants contend that SUPSHIP officials at BIW were under a nondiscretionary, "operational" duty to insist upon implementation of the resulting recommendations. Defendants emphasize language in a letter from the Secretary of the Navy instructing SUPSHIP officials that they "will receive copies of reports of [inspections of private shipyards] and *shall* take action necessary to *require* management to correct unsatisfactory conditions." (emphasis supplied).[8]

In *Shuman,* the First Circuit noted that "shortly after the promulgation of the Minimum Requirements, several compliance surveys of the [shipyard] were completed.

Suggestions for remediation were thereafter made to the Shipyard management." 765 F.2d at 287. Although these suggestions apparently did not concern asbestos, *see id.,* the important point is that the First Circuit considered the fact that actual inspections took place under the Minimum Requirements program. Nevertheless, that court concluded that "the level of enforcement responsibility vested in SUPSHIP falls below the level necessary to ground any claim of operational negligence by SUPSHIP." *Id.* at 292 n. 7. Thus, under *Shuman,* defendants' claim that SUPSHIP officials at BIW were "operationally negligent" in not insisting on the implementation of the 1944 recommendations must fail.

■ Second, defendants rely on NAVSHIPSINST 5100.26, an Instruction issued by the Naval Ship Systems Command to SUPSHIP personnel on February 9, 1971. The Instruction's purpose was "[t]o prescribe appropriate safety precautions during the use of asbestos." Under the heading "Action," the Instruction stated:

> The following safety precautions will be observed by all supervisors and workers engaged in the fabrication, installation and/or removal (rip-out) of asbestos-containing insulation/material. The provisions of this instruction will be effective as of this date. The provisions of this instruction are considered as minimum health and safety requirements; more stringent restrictions may be applied by local Commanders.

The Instruction then outlined six pages of detailed safety procedures, including requirements that asbestos workers be given "indoctrination talks" at least twice annually on proper precautions against asbestos exposure and that adequate warning signs (the texts of which were suggested) be posted at all entrances to areas in which work involving asbestos was in progress. SUPSHIP personnel at BIW forwarded a

---

**8.** This letter from the Secretary of the Navy apparently was part of the record before the *Shuman* court.

copy of the Instruction to BIW with the comment "for information."

This Instruction appears to represent a departure from SUPSHIP's role in private shipyard worker safety as that role is described in the various manuals discussed above. In particular, the Instruction has a very different tone than the 1969 Ship Repair Contracting Manual's Paragraph 12–7(b), which states that "[i]n general, the SUPSHIP surveyor should not be concerned with unsafe practices on the part of the contractor which do not have a direct bearing on the safety of Government personnel or property" because this might "be construed by the contractor as SUPSHIP interference with the normal workings of the shipyard."

In view of this Court's reading of *Dalehite, Varig Airlines, Shuman,* and other post-*Varig Airlines* cases, the Court is unable to conclude on this record that the acts and omissions of SUPSHIP personnel at BIW in enforcing NAVSHIPSINST 5100.26 may be characterized as discretionary. The Instruction's mandatory language and its immediate effective date suggest that SUPSHIP personnel were not to balance policy considerations in deciding whether and when to implement the Instruction. SUPSHIP personnel were not cautioned to temper their enforcement efforts in order to avoid "interference with the normal workings of the shipyard." On the contrary, the Instruction suggests that SUPSHIP personnel may have been under an operational duty immediately to implement its provisions. The fact that local Commanders were explicitly given discretion to implement more stringent requirements further suggests that the duty to implement the minimum requirements of the Instruction was not discretionary. Evidence produced at trial may ultimately lead to the opposite conclusion, but an issue of material fact exists and summary judgment is therefore inappropriate.

Third, defendants rely on a statement by BIW Vice President and Contract Administrator William F. Mussenden that "Navy inspectors make sure that we ... follow precautionary measures in the area of asbestos. I know that." Although Mussenden, whose employment at BIW extends back to 1964, could not remember how far back this had been the case, apparently the SUPSHIP office at BIW acquired a full-time safety officer in 1977. Defendants also point to a statement by Captain Ronald B. Berklite, currently Director of SUPSHIP's Management Division, that such a safety officer would be "primarily concerned with the safety of government personnel and property [and] monitoring contractor performance of contract terms regarding safety and health." There is no other evidence in the record as to the performance, nature, or results of actual inspections by Navy personnel. Issues of material fact exist as to whether, when and in what manner Navy inspectors sought to require BIW to implement asbestos safety precautions. Summary judgment is therefore inappropriate.

### III.

### *Order*

In accordance with the foregoing, it is ORDERED as follows:

(1) That the motion of the United States to dismiss, or for summary judgment on, that portion of Count VI of Model Third-Party Complaint A which asserts a contribution and indemnification claim against the United States based upon section 5(b) of the LHWCA is GRANTED;

(2) That the motion of the United States to dismiss, or for summary judgment on, that portion of Count VI of Model Third-Party Complaint A which asserts a contribution and indemnification claim against the United States based upon the provisions of Maine tort law is DENIED.